2019 IL App (2d) 170373-U
No. 2-17-0373
Order filed November 26, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-922 |
| RICHARD WANKE, | ) ) ) | Honorable Rosemary Collins, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Burke and Hudson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   No error was incurred due to preindictment delay and defendant was not prejudiced as a result; the trial court did not abuse its discretion denying the public defender's motions to withdraw due to actual conflicts of interest; the trial court did not abuse its discretion in the evidentiary rulings that witness statements were also statements of identification; defendant forfeited claims about prosecutorial misconduct and the forfeiture did not constitute ineffective assistance of counsel; and the trial court's inquiry into defense counsels' conduct during trial and potential neglect was adequate and the trial court's judgment was not an abuse of discretion.

¶ 2     On February 6, 2008, attorney Greg Clark was shot three times in his back and killed as he was clearing snow from his driveway and sidewalk during a severe snowstorm that had closed the Winnebago County courthouse in Rockford. At the ensuing jury trial in the circuit court of

Winnebago County, defendant, Richard Wanke, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) and sentenced to a natural-life term of imprisonment based on specific jury determinations as to aggravating factors. Defendant appeals, arguing that: (1) preindictment delay resulted in prejudice or the violation of his constitutional right to a speedy trial; (2) the public defender's office was conflicted and the trial court abused its discretion in refusing to grant the office's various motions to withdraw and defendant's motions to disqualify the office; (3) the trial court abused its discretion regarding the admissibility of statements by certain witnesses which served to bolster their testimony as prior consistent statements under the guise of statements of identification; (4) defendant was prejudiced by misstatements of the evidence during the State's closing and rebuttal closing arguments; and (5) the trial court inadequately considered defendant's posttrial allegations of counsel's possible neglect and erred in failing to appoint new counsel to pursue defendant's claims. We affirm.

¶ 3                        I. BACKGROUND

¶ 4      We summarize the facts elicited at trial and appearing in the record on appeal. On February 6, 2008, at approximately 1:50 p.m., Greg Clark, an attorney who was representing defendant in a burglary case (see *People v. Wanke*, No. 2-08-1031 (2010) (unpublished order under Illinois Supreme Court Rule 23) (*Wanke I*), was shot three times in his back as he was clearing snow during the midst of a heavy snowfall that had shut down Rockford. Clark died from his wounds, which included injuries to his heart and the major blood vessels leading to and from the heart. Later that afternoon, defendant's residence was staked out by the police and, at approximately 6 p.m., defendant was placed under arrest, albeit without a warrant.

¶ 5      At the time of Clark's murder, defendant was free on bond and awaiting sentencing for his

conviction of burglary in *Wanke I*. Defendant was supposed to have been sentenced in *Wanke I* in November 2007, but filed a posttrial motion that required the sentencing to be postponed. Defendant's sentencing was rescheduled to December 2007, but on the day of the sentencing, the courthouse was closed due to a snowstorm. Defendant's sentencing was again rescheduled, this time for February 8, 2008. When defendant was finally sentenced in *Wanke I*, he received a 14-year term of imprisonment.[1]

¶ 6    The police conducted an investigation regarding Clark's murder. They interviewed a number of witnesses, obtained and executed several search warrants, and performed scientific testing on various recovered items. In addition, one of the detectives participating in the investigation, along with his partner, conducted two "travel studies" to attempt to determine the amount of time it would have taken to drive from the victim's house to defendant's residence. Also in February 2008, several witnesses presented testimony to a grand jury. After all of the results of the testing had been returned, the last of which was gunshot residue analysis of items of clothing recovered during a search returned in December 2008, the case lay fallow.

¶ 7    According to defendant and the record, nothing appears to have occurred between

---

[1] Defendant notes that Margie O'Connor, who was then an assistant state's attorney but subsequently joined the public defender's office and was serving in that office during some of the proceedings in this case, obtained a revocation of defendant's bond in an *ex parte* encounter late at night with a judge not otherwise involved in this case. While defendant filed a motion challenging the circumstances of the revocation of bond, it is not raised as an independent issue in this appeal.

December 2008 and April 16, 2014, when the State filed a 30-count indictment charging defendant with the murder of Greg Clark. The indictment charged intentional, knowing, and substantial probability murder (see 720 ILCS 5/9-1(a) (West 2008)) along with the firearm, prevention of a criminal prosecution, and exceptionally brutal and heinous enhancing factors. Before trial commenced, the State filed a notice that it intended to seek a term of natural life imprisonment based on the aggravating factors alleged in the indictment.

¶ 8    On May 2, 2014, a private attorney, Sami Azhari, filed an appearance on behalf of defendant. Three months later, on August 12, 2014, Azhari filed a motion to withdraw which was granted. On August 28, 2014, the trial court appointed the public defender to represent defendant.

¶ 9    On September 3, 2014, David Doll, an assistant public defender, filed the office's motion to withdraw. The motion alleged that there were social contacts between the office and Clark and his family. In particular, the then-Public Defender, Karen Sorensen, had been classmates with Clark's wife from grade school through high school, and Clark's law partner and son-in-law, Barton Henbest, maintained his social contacts with the office during the years following Clark's murder. In addition, the motion pointed out that Margie O'Connor had since joined the office.

¶ 10   On September 12, 2014, the trial court heard the motion. Doll observed that his ability to zealously cross-examine Kris Carpenter, who was listed as a potential witness in the State's disclosures, was perhaps in question, because she was a "dear friend" of his and an assistant public defender at the time of the murder. Doll noted that, of the attorneys in the public defender's office, only he and Sorensen had the authority to authorize the funds for expert witnesses. However, because Doll believed that both he and Sorensen were conflicted with respect to defendant, the other assistant defenders would have no way to obtain the funds needed to engage expert witnesses.

As well, because he and Sorensen were the senior supervisors, the other assistant defenders would have to work without their supervision. Defendant added that, in cases since 2000, he had been represented in Winnebago County by conflict attorneys.

¶ 11    The State did not take a position on the motion to withdraw. The State observed, however, that O'Connor had testified before a grand jury in 2008, thereby "lock[ing] in" her testimony. Likewise, the State noted that the fact that Sorenson and Doll, the public defender office's supervisors, claimed to be conflicted could be problematic for the reasons Doll expressed. Nevertheless, the assistant public defenders were deemed to be independent contractors, so there could not be conflicts disqualifying the entire office.

¶ 12    The trial court held that O'Connor, as a potential witness, was obviously conflicted. The trial court was not convinced that Sorenson was conflicted simply because she attended school with Clark and his wife but determined that it would not require Sorensen personally to try the case. The court determined that there were several attorneys in the office who had not been in the office at the time of the offense, who did not have personal contact and relationships with Clark, and that any of those attorneys would be able to represent defendant without conflict and denied the motion to withdraw.

¶ 13    Following this, the public defender's office assigned Frank Perri as defendant's attorney. On September 18, 2014, Perri filed a personal motion to withdraw, alleging that he had been close friends with and was mentored by Clark. Perri candidly represented that, due to his connections with Clark and his family, he did not believe that he would be able to appropriately represent defendant. At a hearing on Perri's motion, he explained that he had requested both Sorensen and Doll to reassign the case, but they had not done so. The trial court agreed that Perri was conflicted

and inquired whether the second-chair attorney had known Clark or believed that she was conflicted. The second-chair attorney related that she knew Clark, but did not feel that she was conflicted.

¶ 14    Defendant interposed a personal objection to the public defender's office continuing to represent him. He questioned how the office could have assigned the case to Perri, who was so obviously conflicted. The trial court instead viewed the assignment and refusal to remove Perri as confirmation that Sorensen and Doll were not closely involved in the case, which was as it should be. The trial court allowed Perri to personally withdraw, but maintained the appointment of the public defender's office.

¶ 15    On September 26, 2014, after being assigned by the public defender's office, Derrick Schmidt appeared on defendant's behalf. On the same date, defendant filed a *pro se* motion to disqualify the public defender's office, arguing that he lacked confidence in the office due to the fact that all of the attorneys who had been assigned to his case had been conflicted and prejudiced against him. Schmidt was allowed time to determine whether, as defendant's counsel, to adopt defendant's *pro se* motion.

¶ 16    On December 2, 2014, Schmidt filed an amended motion to disqualify the public defender's office. This motion explained more fully the reasons for Sorensen's conflict, including her direct participation for the State in an earlier case. For this reason, when defendant was prosecuted for the burglary case (*Wanke I*), Clark had been appointed as a conflict attorney. The motion also asserted that Doll was conflicted and reasoned that, because both of the public defender's office's supervisory attorneys (Sorensen and Doll) were conflicted, any assistant public defender assigned to the case would lack both the office's "supervisory resources" as well as access

to funds for expert witnesses because only Sorensen and Doll were authorized to make funding determinations.

¶ 17    Next, the motion contended that the assistants with greater seniority and experience were conflicted. Perri's and O'Connor's conflicts had already been discussed in earlier pleadings. The motion purported that a majority of the assistant public defenders were friends with one of the potential witnesses in the case. In addition, the motion recounted that, pursuant to the discovery already turned over in this case, in July 2008, an unnamed assistant public defendant had approached the police about a jailhouse informant who was offering information about defendant.

¶ 18    The motion reasoned that, in light of the supervisors' conflicts, members of the office had twice assisted the police in building cases against defendant, O'Connor's direct involvement in this case for the State, and Perri's opinion of defendant, shared by many of the other attorneys in the office, none of the assistant public defenders could represent defendant without conflict. On the other hand, conflict counsel was available, and the motion requested that the trial court appoint a conflict counsel.

¶ 19    Defendant also filed a *pro se* supplement to the amended motion to disqualify the office. Defendant claimed that, in a private conversation, Schmidt had admitted to being close friends with Carpenter, a potential witness from the office identified by the State, but Schmidt did not know who in the office had assisted the police and who shared Perri's opinions regarding defendant and his guilt. Defendant also noted that Schmidt had admitted to the trial court that he had allowed Doll to review the amended motion to disqualify before it was filed. Defendant admitted that he did not feel that he could share confidential information with Schmidt and was not comfortable that Schmidt and the office would provide him with appropriate representation.

¶ 20     During the course of the hearings on the amended motion to disqualify, it was established that Sheila Zerouali, then an assistant state's attorney, observed "heated exchanges" between defendant and Clark and contacted the police. The police in turn contacted Carpenter, to whom Zerouali had spoken about the "heated exchanges." As well, Carpenter was identified as the attorney of the jailhouse informant who was offering information about defendant. Schmidt maintained that no individual in the public defender's office could effectively represent defendant due to the office's involvement in the prosecution of this case. He emphasized that, because the supervisors in the office were conflicted, none of the assistant public defenders could be properly supervised. Schmidt also revealed that he was not comfortable discussing the case with members of the office because he was unsure of their attitudes toward defendant and the case, and he believed that some members were directly conflicted. Schmidt reiterated that, because Sorensen was the Public Defender, her personal conflict in this case should be imputed to all the members of the office.

¶ 21     The trial court rejected the argument that Sorensen's or other supervisor's conflicts could be imputed to the entire office finding that all the members of the public defender's office were independent contractors who did not share conflicts. Likewise, the trial court dismissed Schmidt's concerns about consulting with the members in his office finding that the two attorneys assigned to the case could consult with each other and noting that a private attorney might not even have anyone else with whom to consult. Finally, the trial court acknowledged that that counsels' inability to receive authorization to expend funds due to Sorensen's and Doll's purported conflicts was a problematic issue, but assured the defense that the court itself had been authorized by the chief judge of the circuit to step in and authorize any necessary expenditures that could not or

would not be considered by the public defender's office, particularly with respect to expert witnesses. Thus, on February 6, 2015, the amended motion to disqualify was denied.

¶ 22    Schmidt continued his representation of defendant until May 2015, when he departed the public defender's office. Defendant's team was replaced by assistant public defenders Nick Zimmerman and Robert Simmons who represented defendant for the remainder of the case.

¶ 23    On January 27, 2016, defendant, through counsel, filed a motion to quash arrest and suppress evidence.[2] The motion to quash arrest and suppress evidence contended that defendant's warrantless arrest at around 6 p.m. on the day of Clark's murder was without probable cause.

¶ 24    On March 1, 2016, counsel filed a fourth motion to withdraw as counsel. In the motion to withdraw, counsel argued that the motion to suppress was based on the fact that O'Connor (then a member of the state's attorney's office) had traveled to the house of Judge Truitt and, at around 11

---

[2] Defendant throughout the course of this case filed numerous and voluminous "declarations" and other pleadings. The trial court informed defendant repeatedly that he had counsel, was not entitled to file pleadings to supplement those of his lawyers, and would not be deemed to be co-counsel with the attendant privileges of such position. The trial court also quite properly informed defendant that those sorts of pleadings would not be read or considered by the court. We will therefore refer to counsels' pleadings on defendant's behalf as "defendant's." We also note that defendant filed pleadings complaining of his attorneys' representation. These were addressed by the trial court as appropriate. Where these sorts of pleadings are relevant, we will indicate when defendant had filed such a pleading and, if necessary, differentiate if from the pleadings filed by counsel.

p.m. on the day of Clark's murder, obtained an order signed by the judge revoking defendant's bond in the burglary case, *Wanke I*. Interestingly, Judge Truitt and the bond-revocation order were wholly omitted from the motion to quash arrest and suppress evidence. Counsel argued that the bond-revocation order would be an issue in the murder case and, because O'Connor was now a member of the public defender's office, counsels' loyalty to defendant would come into conflict with their loyalty to their office and O'Connor.

¶ 25    In denying the fourth motion to withdraw, the trial court first noted that the motion to withdraw seemed concerned with O'Connor's involvement in procuring the bond-revocation order at 11 p.m., yet the motion to quash arrest dealt specifically with defendant's arrest at approximately 6 p.m. The trial court reasoned that there were two issues: first, the probable cause to arrest defendant, and second, the propriety of the bond-revocation order. The trial court noted that, in *Wanke I*, the propriety of the bond-revocation order had been completely litigated, so it believed that there would be nothing that O'Connor would have to add to the instant proceedings. Indeed, the trial court held that O'Connor's testimony about obtaining the bond-revocation order would be irrelevant—only the bond-revocation order itself bore any relevance to the instant case.

¶ 26    The parties then proceeded to an evidentiary hearing on the motion to quash arrest and suppress evidence. During the hearing, neither the parties nor the trial court raised any issue regarding the propriety of O'Connor's visit to Judge Truitt's home. Following the hearing, the trial court concluded that there had been probable cause in the February 6, 2008, warrantless arrest of defendant at approximately 6 p.m. The trial court also denied the motion to suppress evidence because at the time of the revocation of bond, defendant had not been charged with Clark's murder, and, indeed, was arrested in this case only on April 15, 2014, pursuant to an arrest warrant.

¶ 27    Defendant registered his objection to the trial court's ruling and his dissatisfaction with his attorneys' performance. Defendant first asserted that he had been denied his right to testify during the hearing and that Zimmerman would not let him testify. The trial court rejected the argument, noting that, when the court asked whether the defense had any other witnesses, it had indicated that there were none, and defendant had not raised his right and desire to testify at that time. Moreover, the record was replete with instances when defendant had spoken up, including the instant episode, so the court held that defendant had acquiesced when his attorney indicated that no more witnesses would testify on defendant's behalf in the hearing on the motion to quash arrest and suppress evidence.

¶ 28    Defendant also complained about his attorneys' failure to challenge the propriety of the bond-revocation proceedings, particularly O'Connor's visit to the judge's home and the circumstances by which the judge agreed to sign the bond-revocation order. The trial court did not specifically address this contention, tacitly reinforcing its earlier conclusion that the bond revocation had been fully litigated in the burglary case and was irrelevant to the proceedings in this case, particularly in light of the court's judgment that defendant was not arrested in this case until April 15, 2014. Defendant expressed mistrust of Zimmerman; defendant also requested an immediate interlocutory appeal. The trial court denied the request for an immediate appeal because there was no appealable order at that time.

¶ 29    In April 2016, defendant filed a series of *pro se* motions seeking to challenge the trial court's ruling on the public defenders' fourth motion to withdraw. The trial court addressed these motions during several hearings. The court denied the motions and refused to disqualify the public defender's office or the two attorneys representing defendant.

¶ 30    On June 24, 2016, defendant filed a motion to dismiss the indictment due to preindictment delay. Defendant argued that, by the middle of 2008, the police had completed their investigation and nothing else happened to advance the case or discover pertinent evidence until 2014, when the indictment was filed. However, once the indictment was filed, defendant interviewed two possible alibi witnesses who were nine years old at the time of the offense. According to defendant's investigation, the witnesses no longer recalled the events of 2008, but defendant believed that, had they been timely interviewed in 2008, they would have provided defendant with an alibi. Defendant concluded that the witnesses' memory loss significantly prejudiced his defense and requested that the trial court hold a hearing on the reasonableness of the State's delay and, concluding that it was an unreasonable delay, dismiss the indictment with prejudice.

¶ 31    Also on June 24, 2016, defendant filed a notice of alibi defense. Defendant stated he intended to raise an alibi that, on the date of the offense, he had been at his home for the entire day. Defendant appears to infer, therefore, that his alibi witnesses would have stated that they had seen defendant at his home at the time of the murder, but the State's delay in initiating this case resulted in their loss of memory and thus prejudiced his ability to defend the charges.

¶ 32    On July 20, 2016, the trial court heard argument on the motion and took it under advisement because it had not had the opportunity to digest the State's response to the motion to dismiss filed the previous day. On September 7, 2016, the trial court denied the motion to dismiss. The trial court stated:

> "[B]oth parties agree that Mr. Clark was murdered on February 6th of 2008. The defendant
> was indicted for the murder of Mr. Clark in 2014. The defense has filed a motion to dismiss
> for pre-indictment delay as the defendant had not been indicted until a substantial period

of time after the death of Mr. Clark.

[Defendant] was in custody since 2008. But [defendant] was in custody on a separate case.

So, of course, there are issues that are raised anytime there is a delay in the indictment, and the court must consider those issues. Both parties have stated the law that really applies to—to this. The court must complete a two-part analysis where there's been a delay between the alleged crime and indictment or arrest of the—or accusation. The defendant must come forward with a clear showing of actual and substantial prejudice. The—if the accused satisfies the court of actual prejudice then—or [is] substantially prejudiced by the delay then the burden shifts to the State to show the reasonableness or necessity of the delay.

In this case the defendant makes the assertion that he may have had two alibi witnesses, two nine year olds who may have been alibi witnesses for him who have now been interviewed and have no recollection. The courts have dealt with this specifically, and the courts have said that mere assertion of inability to recall is insufficient. So the mere allegation that witnesses may not recall is insufficient under the law to shift the burden to the State to show that the delay was reasonable and necessary.

The court has reviewed all the cases on this issue, and the court finds that this [*sic*] defense has not met their burden. That the allegation that two witnesses cannot recall has not shifted the burden. It is the mere assertion of their inability to recall. And, therefore, the court finds that they have not shifted the burden to the State and have not demonstrated actual and substantial prejudice.

So the court is going to deny the defense motion to dismiss for pre-indictment delay."

¶ 33    In defendant's factual recitation on appeal, defendant mentions a July 20, 2016, *pro se* "motion to compel" the disclosure of any and all conflicts besetting the public defender's office. It appears in the record that the trial court treated this motion like all of the other filings made by defendant while he was represented by counsel—namely, it was made a part of the record and the trial court neither considered it nor ruled upon it.  While the "motion to compel" appears to be adjacent to defendant's numerous complaints about the performance of counsel and motions to disqualify counsel, it lacks the triggering complaint that, due to the purported conflicts, the public defender's office had to be disqualified, and this, we perceive, to be the reason that it was not formally addressed by the trial court.  In any event, at a February 15, 2017, pretrial hearing, the trial court expressly noted for the record that Sorensen was no longer the public defender, thus obviating defendant's concerns that Sorensen's perceived conflicts improperly infected the public defender's office and its continued representation of him.  Defendant, however, noted that Doll had succeeded to the position of public defender and Zimmerman was now the deputy public defender.  No further argument or discussion on that topic was held; moreover, defendant does not seem to have argued at that time that, as currently constituted, the public defender's office continued to be impermissibly conflicted.

¶ 34    Finally, in the run-up to trial, the parties filed numerous motions *in limine*.  Defendant identifies the State's amended 20th motion *in limine* and defendant's 8th motion *limine* as relevant

to his factual recitation.[3]  The State's amended 20th motion *in limine* sought to allow testimony about prior statements of identification of defendant from Jennifer and Peter Kruchten, Alexandra Pro, and Dawn Domino.  The trial court granted the State's motion.

¶ 35    Defendant's eighth motion *in limine* sought to admit evidence tending to discredit the State's theory that defendant and Clark's relationship was "contentious."  Defendant sought to counter this with testimony about other of Clark's clients who sought to remove him as counsel or otherwise exemplified similar "difficulties in communication" between Clark and the client.  To that end, defendant attached an August 26, 2002, motion which, while lacking other case-identification, purported to be advanced by Patricia Wakenight seeking to remove Clark as her counsel due to various issues existing in their attorney-client relationship.  The trial court denied defendant's motion *in limine*.

¶ 36    Finally, on February 27, 2017, jury trial in this matter commenced.  Phyllis Clark, the wife of Clark, testified that, in 2008, they lived on the "far east side of Rockford" at the corner of Oakforest Drive and Sentinal Road.  On February 6, 2008, Clark had stayed home from work due to severe weather snowing them in.  After lunch, Clark went outside to clear the snow from their

---

[3] We note with no small displeasure that defendant's citations to the record for these documents are hopelessly incorrect and confusing.  It is not this court's obligation to search the record for the precise document identified by a party.  See Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018) (party is to provide accurate citation to record in statement of facts).  We additionally note that defendant has chronically misspelled the names of witnesses and numerous individuals identified in the record, and we have endeavored to use the correct spellings as best we could.

driveway and sidewalk. Phyllis Clark heard what she believed to be three gunshots and immediately looked outside. Phyllis Clark testified that she saw a person dressed in dark clothing standing near a blue minivan. Phyllis Clark went outside and discovered Clark lying on the sidewalk along Sentinel next to the running snowblower. She testified that the blue van turned right onto Sentinel and drove away.

¶ 37 Phyllis Clark identified the vehicle in the State's exhibits as the van she saw on February 6, 2008. She confirmed her identification due to its color and its gold-colored tire rims.

¶ 38 The State's evidence established that Clark was shot three times in the back. The gunshot wounds caused his death.

¶ 39 One neighbor, Pamela Laughlin, testified that on February 6, 2008, she heard three gunshots. She looked at her clock, noting the time to be 1:54 p.m.

¶ 40 Other neighbors, Ingvar Carlson, Jennifer and Peter Kruchten, Christopher and Alexandra Pro, testified to observing a blue minivan with gold-colored tire rims either driving into the development or exiting the development. These witnesses generally testified that, during the evening of February 6, 2008, they were taken to view a van by the police and that they all believed it to be the same they saw and the same that was depicted in the State's trial exhibits.

¶ 41 Carlson also testified that, after he arrived home, he immediately began to clear the snow. Approximately three to five minutes after beginning to clear the snow, he heard two or three gunshots, looked in the direction of the gunshots and observed Clark lying next to his snowblower on the ground, and observed a person running from Clark's body. Carlson later spoke to a detective and described the running person as tall and wearing dark clothing.

¶ 42 Both Jennifer and Peter Kruchten testified that, when they were returning home, they

passed the blue minivan and observed the van's driver. Jennifer testified that the driver was a white man in his early 50s with sandy light brown or dark blond hair, balding in front, no beard, and wearing "very large prominent glasses." Later that evening, Jennifer was taken to the Public Safety building, she was shown a photo-array in which was included a picture of defendant without his glasses, and she picked two pictures as possibly being the man she saw driving the van. One of the two pictures was of defendant. A few days after the shooting, Jennifer saw a newspaper article about Clark's shooting which contained a picture of defendant. Jennifer testified that the picture in the article was of the man she had seen driving the van on February 6. She informed Peter that she thought the man in the picture was the man driving the van, and she told the police the same thing.

¶ 43 Peter testified that, when he passed the van, he became fixated on the clothing the driver was wearing, particularly the cuff of the jacket the driver was wearing. At trial, Peter identified a denim jacket as having the same cuff that the driver was wearing. Peter was shown a photo lineup during the evening of February 6 but was unable to identify anyone. After the shooting, he saw a newspaper article and believed the picture to resemble the man he had seen driving the van, and Peter informed police.

¶ 44 Alexandra Pro testified that, as they were returning to their home on February 6, she and her father saw a van that Alexandra believed belonged to a friend's mother. When she looked at the driver, she realized it was not her friend. She described the driver as a white man with long greasy hair and stubble on his face. The man was also wearing glasses and a hat. Alexandra testified that, later that day, she was unable to identify anyone in the photo lineup she was shown. A few days later, she looked up a news story about the shooting on her computer. The story had

a photo and the photo depicted the man she had seen driving the van. On February 13, 2008, Alexandra met with police and informed them that the photo from the article depicted the van's driver she had seen on the day of the shooting.

¶ 45    Christopher Pro testified that he noticed the blue van because he believed it was driving too fast for the snowy conditions. Christopher testified that he had to focus on the van (and particularly the tires with the gold rims) to make sure that is would not collide with his car.

¶ 46    Clara Arco testified that, at the time of the shooting, she was seven years old. On February 6, 2008, she was outside playing with her dog. Clara was interviewed by the police a few days after the shooting. She informed the police that she had seen Clark clearing snow and observed "a guy in a gray hoodie and jeans and black shoes c[o]me up and sho[o]t [Clark]." The man then got into a van parked on Oakforest and left. She testified that she thought the van was "bluish-green." Clara testified, however, that, as of the date of her testimony, she was unsure whether she was testifying to her actual memories or whether, through conversations with family and neighbors at the time, she was simply remembering what she had been told.

¶ 47    James Arco, Clara's father, testified that, on February 6, 2008, Clara had gone out to play that afternoon. She came in suddenly, appearing to be upset. James also testified that Clara had gone hunting with him on occasion and was familiar with the sound of gunshots.

¶ 48    Police officers who interviewed Clara both on the day of the shooting and a few days later testified that Clara told them she saw two people standing near each other near her bus stop (which was on the corner of Oakforest and Sentinel, where Clark's house was located). Clara heard three gunshots, and one of the people got into a blue van. She told one of the officers that the man who ran to the van was wearing dark clothes and a gray hoodie.

¶ 49    The State also questioned two witnesses about observations made days before the shooting. Terri Misner testified that, On February 5, 2008, around 12:15 p.m., she noticed a blue van with gold tire rims parked on Sentinel facing west. The van's driver was a light-skinned woman with long dark hair and glasses. Misner testified that she observed the van turn around and drive off east along Sentinel.

¶ 50    Misner testified that the van shown in the State's trial exhibits was the van she had seen on February 5. During the evening of February 6, 2008, Misner identified the van to police. She was also shown a photo lineup and identified Diane Chavez as the driver of the van. Chavez, the record shows, was defendant's landlord and roommate and owned the blue van with gold tire rims.

¶ 51    Dawn Domino testified that she lived near Clark's house on a different street. On either February 4 or 5, 2008, she noticed an old, boxy, 1970s-style red or brown pickup truck parked hear her house. She recalled the driver because he looked at her with a "mean and angry face," which frightened her. Domino described the driver as a white man who had "stringy blondish-dark hair," a mustache and beard, and glasses. Domino testified that, on February 8, 2008, she saw a newspaper story about the shooting that had a photograph of a man that she recognized to be the man she had seen in the pickup truck who frightened her. She told the police and identified defendant's picture from the newspaper article.

¶ 52    Defendant notes that, "[o]ver a continuing and occasionally-repeated defense objection, the [trial court] allowed the State to introduce more testimony concerning the prior statements by the above eyewitnesses." Defendant does not identify specific witnesses (other than a cite to a reiterated objection during the testimony of Detective Brad Shelton recounting what he had been told by Christopher Pro). The State also wished to obtain clarification regarding the motion *in*

*limine* allowing police officers to testify about the identifications they received from the various witnesses. Defendant objected, contending that, because the witnesses had testified, allowing the officers to reiterate the witnesses' identification testimony was cumulative. The trial court agreed, noting that the objection to the cumulative testimony was valid. The trial court allowed the testimony in, admonishing the State, "don't be cumulative and don't ask for things that cannot be brought in." Defendant does not appear to have objected to the ensuing testimony as violating the trial court's admonition.

¶ 53    Detective Eddie Torrance, of the Rockford Police Department, testified that, at 1:54 p.m. on February 6, 2008, he was parked at the public safety building when he heard a call concerning a shooting at Clark's address. Torrance drove to the scene in a marked police vehicle with lights and siren activated. Torrance testified that, due to the snowy conditions on the roadways, he drove down the center of the streets. Torrance testified that he did not recall the amount of time it took to arrive at Clark's house, but he noted that, due to the conditions, traffic was moving "very slow[ly]."

¶ 54    Torrance testified that, roughly halfway through his drive, he noticed a dark blue van that was not pulling over to the side of the road. The van was covered in snow, so he was not able to read the license plate. Torrance did not include this observation in any reports he wrote that day, and he did not mention it to any other officers that day. However, sometime in March 2008, Torrance noticed a picture of Chavez's van (which picture was used as an exhibit during the trial) on his sergeant's desk, and he realized that it depicted the van he saw failing to pull over to the side of the road on February 6.

¶ 55    A number of other police officers described their investigation of the scene, collection of

evidence, interviews with witnesses. In general, the officers testified that they brought the witness to the Public Safety Building or else the location of Chavez's van, gave the witness an opportunity to identify the van, and indicated whether the witness did or did not identify the van. Likewise, the officers testified about presenting photo lineups to the witnesses. The photo lineup presented on February 6 contained pictures of defendant not wearing glasses. The witnesses did not make an identification of defendant at that time. However, due to the newspaper article with defendant's picture, a number of the witnesses informed the police that they could identify the picture as the man they saw driving the van on the day of Clark's murder.

¶ 56 In detailing their investigation, the police witnesses testified that, in 2008, defendant lived in a two-flat building with his landlord, Diane Chavez. The evidence showed that the ground floor appeared to be used as an office-type space, and the upper floor was the residence. Chavez also owned the van depicted in the State's trial exhibits and identified by a number of the witnesses. It was a 1998 Dodge Caravan with the "gold package" option, meaning it had gold-colored tire rims. The police investigation showed that at that time, there were three 1998 Dodge Caravans with the gold package registered in Winnebago County.

¶ 57 On February 6, 2008, the police discovered Chavez's van parked a block-and-a-half away from Chavez's and defendant's residence. Several officers described the arrest of defendant, which occurred at approximately 6 p.m. on February 6. Defendant was walking toward the van and walked behind a surveillance vehicle, causing the surveillance vehicle to move. Defendant appeared to lock eyes with one of the officers and change his direction of travel. The police then arrested him.

¶ 58 Charles Smith testified that he worked with Chavez and became very friendly with Chavez,

to the point that she was involved in his financial and health affairs. Smith was also friends with defendant. Smith testified that Chavez had access to his house with keys and a garage door opener. Smith testified that, on February 6, 2008, he returned to his home after work at about 4:30 p.m. He observed Chavez's van parked in front of his house, and the defendant was inside his home using the computer. Defendant left shortly after Smith returned. As defendant was leaving, he told Smith that he had left the basement light on and offered to go and turn it off. Smith refused the offer. Smith testified that defendant did not explain what he had been doing in the basement; the State introduced some of Smith's grand jury testimony in which Smith testified that defendant told him he had been doing laundry. Smith was unable to recall what car Chavez had driven to work on February 6; Smith's grand jury testimony stated that he saw Chavez's red Dodge Neon, not the van at issue.

¶ 59 Jeremy and Jessica Berg, who were Smith's neighbors, testified that, on February 6, 2008, between 2:15 and 2:45 p.m., the each noticed Chavez's van parked outside of Smith's house. Each testified that the observed a man in Smith's driveway. Jeremy described the man as someone whom Smith referred to as "Richard," and described his physical characteristics as a white male in his 40s, tall, with long, sandy blond hair in a ponytail, wearing blue jeans and a baseball cap. Jessica described the man as a middle-aged white male with long blond hair, a goatee, and wearing glasses and a dark jacket.

¶ 60 Late in the night of February 6 and extending to the early morning hours of February 7, 2008, the police searched Smith's residence, as well as defendant's and Chavez's residence. In Smith's house, police recovered a garbage bag full of freshly laundered and still wet clothing, washcloths, and dish towels. Testing revealed that several clothing items contained genetic

material from which defendant could not be excluded as the donor. The police also seized Smith's computer. At defendant and Chavez's residence, police seized four computers and a microcassette tape.

¶ 61    Police analyzed the computers. According to the analysis, none of the computers from defendant and Chavez's residence showed any hard drive activity occurring between 3:15 a.m. and 2:46 p.m. on February 6, 2008. Regarding the computer seized from Smith's residence, for February 6, 2008, the computer showed no files created between 12:59 p.m. and 2:12 p.m., no files modified between 11:07 a.m. and 12:54 p.m., and no files accessed between 10:48 a.m. and 3:15 p.m. A different analysis of the computer from Smith's residence showed several instances of user-initiated internet activity occurring on February 6, 2008: at 8:17 a.m., 11:08 a.m., 11:28 a.m., and 5:27 p.m.

¶ 62    Additional evidence showed that, on February 6, 2008, at 2:15 p.m., a landline associated with defendant's and Chavez's residence placed a call to Chavez's work phone. In addition, defendant possessed a cellular phone registered to the name of David Emmons.

¶ 63    The State introduced evidence supporting its theory that defendant and Clark had a contentious relationship. Sheila Zerouali, the assistant State's attorney who prosecuted the burglary charge in *Wanke I*, testified that her and Clark's trial preparation was interrupted and the trial delayed, because defendant had given copies of certain photographs to Clark, but not the originals. Defendant was eventually tried and convicted of burglary. On November 5, 2007, Clark filed a motion for a new trial on defendant's behalf. The burglary matter was continued to December 11, 2007, but a winter storm closed the courthouse on that date, so the sentencing in the burglary matter was rescheduled to February 8, 2008. Zerouali testified that, over the course of

the burglary trial, she observed that, in March 2007, the two appeared strained and frustrated with each other, and this increased over time to the point that, at a later hearing, they were cutting each other off and both looking very strained and tense. The State also introduced excerpts from transcripts from the proceedings in *Wanke I*. The excerpts detailed the desire of Clark to withdraw his representation of defendant, the communication difficulties between them, and defendant's complaints of Clark's alleged ineffective assistance. In addition, the State presented excerpts from defendant's motions complaining about Clark's representation in *Wanke I*. The State also introduced the contents of the microcassette recording for the purpose of illustrating the relationship between defendant and Clark.

¶ 64    The State also presented evidence regarding the November 4, 2007, shooting outside of Clark's home. November 4 was the day before defendant's originally scheduled sentencing hearing in *Wanke I*. Clark was taking out the garbage and heard four gunshots and smelled the odor of gunpowder. The neighbor across the street's front window was broken and a bullet lodged in the living room wall. Nothing was done about the bullet until the murder, when it was recovered from the neighbor's wall and tested. The testing showed that the bullet had been fired from the same gun as the bullets recovered from Clark's body.

¶ 65    In March 2008, the police also conducted travel studies to determine how long it might take to travel between Clark's house and defendant's residence. The officer testified that, in the first study, under clear conditions, the trip took 18 minutes including 3 minutes and 20 seconds stopped at traffic control devices. In the second study, conducted on a snowy day, but not as snowy as on February 6, 2008, the trip took 18 minutes and 40 seconds including 2 minutes and 50 seconds stopped at traffic control devices. The police also timed every stoplight and determined

that they could increase the time of the trip by up to nearly nine minutes.

¶ 66    The defendant points to a number of instances of prosecutorial misconduct where the State misrepresented the evidence or made purportedly inappropriate arguments to the jury.  In the State's initial closing argument, the prosecutor argued that, on February 6, 2008, "all activity went dark from 11:00 until I believe it's later afternoon, approximately 5:00 p.m."  Defendant did not object.  The prosecutor also stated that Christopher Pro provided the same identification details as the other witnesses: "Forty- to fifty-year-old, glasses, grayish hair, scruffy beard, dark blue Dodge minivan with gold hubcaps."  Defendant did not object.

¶ 67    During the State's rebuttal closing argument, the prosecutor repeatedly argued that defendant killed Clark to remove him from his burglary case (*Wanke I*).  Defendant identifies eight specific instances of this motive argument:

(1)    First, the prosecutor argued, "there's only one person that wanted Greg Clark off the case, and he sits right over there (indicating)."

(2)    The prosecutor argued that, after shooting Clark, defendant thought, "*Done with him.  He's off my case.  He's not gonna control things anymore.  I'm gonna be in control— by any means necessary.*"  (Italics in original.)

(3)    The prosecutor described the shooting as follows:

"Caught Mr. Clark totally off guard.  Totally off guard.  Turns his back and takes three in the back, on his client, because he didn't want Mr. Clark any longer on his case.  He didn't want him appearing on his case.  And the only way to be certain of that was to take Mr. Clark out.  And he did."

(4)    The prosecutor argued that defendant acted "by any means necessary [to] take Mr.

- 25 -

Clark out to get Mr. Clark off of his case."

(5)     The prosecutor argued: "We have a disgruntled client of Mr. Clark, a breakdown in communication, a failure to communicate, quite frankly, with Mr. Clark, with the court, because the defendant wants Mr. Clark off of the case and that's not going to happen—not unless [defendant] takes matters into his own hands."

(6)     The prosecutor argued: "Each time there was an attempt on Mr. Clark's life, the defendant was on notice that Mr. Clark was not getting off his case."

(7)     The prosecutor asked the jury: "So what do we have?  We have a defendant; we have Mr. Clark.  We have a defendant not wanting Mr. Clark to be his attorney anymore, so he took that matter in his own hands."

(8)     The prosecutor concluded her argument with the following:

"All of you today: Who wanted Mr. Clark dead?  Who wanted Mr. Clark off the case?  Who, by any means necessary, was going to get Mr. Clark off the case?  Who turned mission impossible into mission possible?  The killer sits there (indicating).  His picture revealed to you through the eye testimony of all the witnesses who saw him that day, who saw him before that day.  He wanted Mr. Clark dead because that was the only way to get Mr. Clark off of his case."

Defendant did not object to any of the enumerated prosecutorial statements.

¶ 68     Defendant notes that the prosecutor argued that, according to Clark's schedule, defendant's was the only case for which he had to appear in court in the days following the shooting instances occurring in November 2007 and February 2008.  Regarding the fatal shooting, the prosecutor argued that defendant chose the place of the shooting because defendant knew that the courthouse

was closed due to the weather and knew that Clark would not have to attend to any legal business that day. Defendant did not object.

¶ 69 The prosecutor argued that Smith found the bag of wet clothes in his basement and called the police to report it. Defendant did not object.

¶ 70 Defendant emphasizes that "[t]he prosecutor argued that when the four eyewitnesses all failed to identify the defendant in the February 6, 2008, photographic array, they nevertheless 'said' that his hair and beard matched those of the driver." Defendant did not object to this passage.

¶ 71 Defendant also notes that the prosecutor "also argued that the four witnesses who had seen the defendant's picture in the newspaper immediately called the police to report that he was the person they had seen." To illustrate, defendant quotes the following passages from the prosecutor's rebuttal argument:

"[The neighbors/eyewitnesses are] the ones calling the police; the police aren't calling them. They are on the phone, fast dialing—whatever—contacting the police, telling them, 'That's the man.'

And who is the man? It's the defendant (indicating).

Nobody told them who to pick out. They recognized him because they had seen him. He's the man driving the van the day Mr. Clark is murdered. He's the man running to the van. He's the man in the neighborhood the day before Mr. Clark is murdered. The recognized him."

¶ 72 Defendant did not object to those passages.

¶ 73 Defendant last points to the following portion of the rebuttal closing argument regarding the motivation of the neighbors:

"Their only motive, ladies and gentlemen, is to tell the truth about what they saw. That's their only motive. And they saw him. They didn't see anyone else running to that van. They saw the defendant. And that's what they told you, and that's what they told the police officers. And they recognized him, and they identified him."

¶ 74    Defendant did not object.

¶ 75    Eventually, the jury found defendant guilty of first degree murder. The jury also made the requested special findings, determining that: (1) defendant personally discharged a firearm and caused Clark's death; (2) Clark was over 60 years of age; (3) the murder was cold, calculated and premeditated; and (4) the murder was exceptionally brutal and heinous. On April 3, 2017, the trial court entered judgment on the jury's verdict of guilty on all 30 counts of the indictment.

¶ 76    Also on April 3, 2017, defendant's counsel filed a motion for a new trial. On that same date, defendant filed his *pro se* addendum to defense counsel's motion for new trial. The trial court once again admonished defendant that he was represented by counsel and that his *pro se* addendum was without legal effect, but it allowed the filing nonetheless. Additionally, the court admonished defendant that it would not consider the filing in any way.

¶ 77    On May 10, 2017, counsel filed an amended motion for new trial. Among the allegations in the motion were claims that the trial court erred by denying the public defender's offices motions to withdraw, by denying defendant's motion to dismiss due to preindictment delay, and by admitting evidence of various witnesses' prior consistent statements.

¶ 78    Also on May 10, 2017, defendant filed a *pro se* response to the State's response. Once again, the trial court admonished defendant that his *pro se* filings while represented by counsel would not be considered. On May 18, 2017, after sorting out whether counsel would adopt any of

defendant's *pro se* pleadings (counsel did not), the trial court denied defendant's amended motion for a new trial.

¶ 79    On May 23, 2017, defendant filed his *pro se* motion for preliminary inquiry on ineffective assistance requesting a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). The motion alleged, among other things, that counsel did not call Chavez as a witness and did not utilize Chavez's documentation indicating that she could not have been in Clark's neighborhood when Misner claimed to see her. Defendant supported this claim with Chavez's affidavit averring that the she used her February 5, 2008, lunch hour to eat lunch, withdraw money from an ATM, and pay a parking ticket at the city hall. Attached were Chavez's receipts showing that between 12:14 p.m., and 12:23 p.m., she was engaged in these activities.

¶ 80    The motion alleged that counsel had failed to investigate other of Clark's clients who were dissatisfied with his representation. Defendant alleged that Robert Appelgren, who was a white male of similar age and appearance as defendant, was a disgruntled client of Clark who was "crazy enough to shoot" Clark. Defendant attached records showing that Robert Appelgren had an extensive criminal history and had sued other attorneys. Defendant also alleged that Patricia Wakenight had complained to the Attorney Registration and Disciplinary Commission about his representation of her and attached her complaint letter and a copy of her *pro se* motion seeking to remove Clark from her case.

¶ 81    Last, defendant alleged in the motion that counsel had not objected to the State's "numerous inappropriate comments during closing argument." Defendant referred to his own filing for a new trial in which he detailed counsel's failure to object. In addition, defendant noted that counsel, in arguing the motion for new trial, attempted to point out "several of the egregious,

unreasonable inferences or misstatements" by the prosecutor in her rebuttal closing argument, but the argument was short-circuited when the State pointed out that counsel had not objected during the argument itself.

¶ 82    On the same day, May 23, 2017, the trial court conducted an inquiry into defendant's motion. Defendant read from a prepared statement for a period (consisting of 20 pages of the record of proceedings). After defendant began recounting the forecasts for the snowstorm that affected Rockford on the day of Clark's murder, the trial court interrupted defendant and inquired what remained. Defendant replied had had 10 more pages to read, and the trial court refused to allow him to continue to read, stating that, instead, she would read his motion and exhibits as well as the remainder of the prepared statement. After an adjournment for the court to read the material defendant submitted, the trial court asked counsel to reply to defendant's motion. Counsel stated that he did not have a specific response but indicated that he would respond to the court's specific questions.

¶ 83    Zimmerman stated that much of defendant's complaints were matters of strategy. Responding to the complaint that Chavez was not called, Zimmerman explained that she had not been called as a witness because Zimmerman preferred to insinuate that Chavez was involved and allow the jury, because there was no accountability theory, the option to infer it was Chavez rather than defendant who was responsible for the shooting. Defendant notes that the trial court did not ask why Zimmerman failed to object the State's improper arguments or whether he had investigated other suspects. The trial court did ask Zimmerman whether he failed to adequately investigate the matter, and Zimmerman replied that he had not.

¶ 84    The trial court stated:

"Okay. The Court has read over [defendant's] comments. I have read his motion for preliminary inquiry of ineffective assistance of counsel. And I find that—and I was present during all of the trial and all of the pretrial motions. Counsel, did, I think, adequately and adversarially test the evidence against [defendant] for the purposes of this preliminary inquiry. I find that [defendant] has failed to bring any evidence forward, any credible evidence forward that there is anything that could possibly be construed to be ineffective assistance of counsel, and the Court is going to deny the motion for a *Krankel* hearing, as I find that his claims are without merit."

¶ 85    The matter moved to the sentencing hearing, and the trial court sentenced defendant to a term of natural-life imprisonment. Defendant timely appeals.

¶ 86                                    II. ANALYSIS

¶ 87    On appeal, defendant contends the trial court erred in refusing to dismiss this case over the six-year preindictment delay. Next, defendant contends that the trial court abused its discretion by denying the motions to withdraw from the public defender's office. Defendant next argues that the trial court abused its discretion by allowing the State to bolster the eyewitness testimony with the witnesses' prior consistent statements. Defendant argues that he was denied a fair trial due to the many misstatements of evidence in the State's closing arguments. Finally, defendant argues that the trial court abused its discretion by refusing to appoint new counsel where defendant had demonstrated the possibility that counsel had neglected his case. We consider the contentions in turn.

¶ 88                                 A. Preindictment Delay

¶ 89    Defendant argues that the six-year gap between his arrest for the murder of Clark and the return of the indictment charging him with the offense violated his constitutional rights so that the trial court erred in refusing to dismiss the indictment.    This issue is analytically quite straightforward despite defendant's contentions.    Accordingly, we shall begin our analysis with the proper framework for the preindictment delay inquiry before later addressing defendant's specific contentions as necessary.

¶ 90    In *People v. Lawson*, 67 Ill. 2d 449, 459 (1977), our supreme court, relying on *United States v. Marion*, 404 U.S. 307 (1971), held that a claim of preindictment delay is initially considered in a two-step process.    First, where there has been a delay between an alleged crime and an arrest, accusation, or indictment, the defendant must make a clear showing of actual and substantial prejudice.    *Id.*    If the defendant satisfies the trial court that he or she has been actually and substantially prejudiced by the delay, the burden is shifted to the State, which must show the reasonableness or necessity of the delay.    *Id.*    If the initial process demonstrates both substantial prejudice and reasonableness of a delay, the court will then proceed to the next step and decide by balancing the interests of the defendant and the public.    *Id.*    If the defendant fails to establish prejudice, the inquiry stops at that point, and there is no need for the court to consider the reasonableness or necessity for the delay.    *Id.* at 459-60.    This analytical framework is now well established.    See *People v. Kilcauski*, 2016 IL App (5th) 140526, ¶ 23 (same analytical framework) *People v. Daniels*, 2015 IL App (2d) 130517, ¶ 19 (same); *People v. DiBenedetto*, 93 Ill. App. 3d 483, 487 (1981) (same).    Likewise, it is well established that a defendant's or witness's inability to remember generally will not constitute actual and substantial prejudice.    *Lawson*, 67 Ill. 2d at 458-59; *People v. Carter*, 168 Ill. App. 3d 237, 247-48 (1988).    We review *de novo* the trial court's

judgment on a motion to dismiss the indictment due to preindictment delay. *People v. Goad*, 2013 IL App (4th) 120604, ¶ 25.

¶ 91    With the foregoing principles in mind, we are now confronted with the threshold issue of whether defendant made a sufficient showing of actual and substantial prejudice to trigger inquiry into the reasonableness or necessity of the preindictment delay. Defendant argues that prejudice was demonstrated by the fact that two potential alibi witnesses, nine-year-old twins in February 2008, through the passage of time, have lost their memories of February 6, 2008, and were not contemporaneously interviewed to preserve their potential testimony. The trial court held that the potential witnesses' memory loss (essentially rendering them unavailable) was insufficient to shift the burden. We agree.

¶ 92    We note that defendant characterized the witnesses as providing additional alibi evidence. The fact that they would provide additional evidence suggests that defendant had other alibi evidence available. Thus, the functional unavailability of the two witnesses did not hamper his ability to prove alibi evidence as the witnesses were additional. Defendant clearly does not argue that the witnesses were necessary and held the only evidence of alibi.

¶ 93    In addition, defendant does not explain what the evidence was to be. Without an explanation of the potential evidence, his claim devolves into a claim of possible prejudice, especially since defendant deemed the witnesses as having "additional" evidence.

¶ 94    Defendant contends that the trial court erred in holding that *Lawson* and *DiBenedetto* stood for the proposition that loss of memory or witness unavailability occasioned by preindictment delay could never amount to substantial prejudice. Defendant is correct (and we note that we do not view *Lawson* and its progeny in the categorical fashion defendant ascribes to the trial court),

but even so, the trial court's judgment, that defendant had not established actual and substantial prejudice, was correct. See *People v. Mueller*, 2018 IL App (2d) 170863, ¶ 16 (the appellate court reviews the trial court's judgment, not its reasoning). The trial court was correct because the potential alibi witnesses would have provided additional alibi evidence and, even as developed on appeal, the details of the potential testimony presented are so vague, it is impossible to determine whether that evidence would nevertheless have been able to be harmonized with the other evidence in the record.[4] In other words, under the circumstances apparent in the record, defendant has demonstrated only the possibility of prejudice, not actual and substantial prejudice.

¶ 95     In support of his point, defendant cites *United States v. Lovasco*, 431 U.S. 783 (1977), for the proposition that the unavailability of a witness, through memory loss or death or other means, may constitute actual and substantial prejudice to require consideration of the reasonableness and necessity of the delay. What we have said does not conflict with *Lovasco*, so *Lovasco* does not impact our analysis, particularly because that case concerned the reasonableness of the preindictment delay, not whether the defendant had demonstrated actual and substantial prejudice (which was accepted). *Lovasco* is therefore unavailing.

---

[4] We note that defendant argues only that the witnesses "would have testified that they saw the defendant outside [of his residence] around 2:00 p.m. that day." This "summary" of the potential testimony is sufficiently imprecise that, based on the record, defendant could have been spotted at his residence "around" 2 p.m. and still have committed the offense, fled the scene, and returned to his residence where, "around 2:00 p.m.," he was observed by the witnesses.

¶ 96    Defendant further assails reliance on *Lawson* and *DiBenedetto* because those cases involved each defendant's loss of memory, not a witness's loss of memory.  The contention, however, is not directed at the analytical framework, and we accept the principle that, under appropriate circumstances, a witness's loss of memory may constitute actual and substantial prejudice.  As explained, however, under the circumstances here, defendant has demonstrated only the possibility of prejudice, so the trial court's judgment was correct.

¶ 97    Defendant also argues that, rather than using the *Lawson* framework, we should instead use the constitutional speedy-trial analysis employed in *Barker v. Wingo*, 407 U.S. 514 (1972). Defendant reasons that he was arrested for the murder of Clark, and that should have started the speedy-trial clock, at least for purposes of the federal constitution.  We disagree.

¶ 98    On February 6, 2008, defendant was arrested without a warrant.  At the time of his arrest, defendant stood convicted of burglary in *Wanke I*, and was free on bond pending sentencing.  On the same day, defendant's bond was revoked, and he was thereafter held in connection with the burglary case, up to and including the filing of the indictment in this case.  Defendant was not charged with Clark's murder by information at any time before the April 16, 2014, indictment for Clark's murder.

¶ 99    It is well established that cases involving preindictment delays, *i.e.*, delay between arrest and indictment, are analyzed under the *Lawson* framework.  *People v. Silver*, 376 Ill. App. 3d 780, 783 (2007).  By contrast, a delay in arresting the defendant after an indictment has issued is addressed pursuant to the federal constitutional speedy-trial right under the sixth amendment.  *Id.* This constitutional speedy-trial analysis follows *Barker* (adopted in Illinois in *People v. Bazzell*, 68 Ill. 2d 177, 182 (1977)), and consists of four factors: (1) the length of the delay; (2) the reasons

for the delay; (3) the defendant's assertion of his or her speedy-trial right; and (4) the prejudice to the defendant resulting from the delay. *Silver*, 376 Ill. App. 3d at 783.

¶ 100   Here, defendant was arrested without a warrant while he was already convicted of burglary and free on bond pending sentencing in that case (*Wanke I*).  During the pretrial proceedings in this matter, the court determined that probable cause existed to believe that defendant had committed a crime at the time of his warrantless arrest, so the arrest was valid.  On the same day as the arrest, defendant's bond in the *Wanke I* case was revoked and he was held in custody pursuant to the bond revocation and his eventual sentence in *Wanke I*, from that day until the indictment in this matter was returned.  Thus, the delay in this case is preindictment delay, not one of delay in arresting the defendant after criminal charges had been preferred.  Therefore, *Lawson*, not *Barker*, applies to the analysis of the delay in this case.

¶ 101   In *United States v. MacDonald*, 456 U.S. 1, 6-7 (1982),[5] the Supreme Court discussed *Marion* (upon which our supreme court relied in *Lawson*) and constitutional speedy-trial right. Quoting *Marion*, the Supreme Court noted that it had held "that the Speedy Trial Clause of the Sixth Amendment does not apply to the period before a defendant is indicted, arrested or otherwise officially accused."  *Id.*   The Supreme court held that, "[a]lthough delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, (citation), or to a

---

[5] This case was the subject of the State's tardy motion to cite additional authority.  At oral argument, defendant indicated that he had no objection to the motion.  Accordingly, we grant the State's motion to cite *MacDonald* as additional authority.

claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending." *Id.* at 7.

¶ 102   Defendant focuses on "arrest" as the trigger for the inquiry into whether his speedy-trial rights under the constitution were violated.  As *Lawson* makes clear, however, arrest cannot be the triggering event because "there is no right to be arrested once an alleged violation has occurred." *Lawson*, 67 Ill. 2d at 457.  Moreover, even though *MacDonald* appears to treat "indict[ment], arrest[], or *** official[] accus[ation]" as equivalent (*MacDonald*, 456 U.S. at 6), it nevertheless makes clear that the indictment-arrest-official-accusation troika applies only to those against whom a prosecution has been instituted (*id.* at 6-7).  Indeed, if an arrest were held to begin a prosecution, absurd results would necessarily follow.  This is not to say that an accused is without protection in the preindictment period; rather, the accused remains protected albeit under the *Lawson* framework of inquiry: a showing of actual and substantial prejudice, the State's explanation, and, if the explanation for the delay is reasonable, the court balances the competing interests.

¶ 103   While an "arrest" is a significant step, the concern, expressed in *Marion* and adopted in *Lawson*, is over the interference with the defendant's liberty, the disruption of the defendant's employment, financial resources, the possible subjection to public obloquy, and the creation of anxiety for the defendant and his family and friends.  *Marion*, 404 U.S. at 320.  Here, because defendant was properly held pursuant to a bond revocation while he awaited sentencing for the burglary for which he was convicted in *Wanke I* and thereafter while he was in custody on his sentence, the *Marion* concerns are almost wholly obviated.  Defendant's confinement during all times of the period between his bond revocation and indictment for murder was proper.  In other

words, had defendant only been taken into custody for the crime of murder only upon his indictment (and arguably, this is what actually occurred), he would nevertheless been in custody at all times after his arrest until his indictment due to the bond revocation and sentence in *Wanke I*. Thus, the *Marion* concerns never really came into play.

¶ 104   We also note that prosecution is defined as "legal proceedings *** commencing with the return of the indictment or the issuance of the information." 720 ILCS 5/2-16 (West 2008). It is the State's Attorney who has the authority and discretion concerning commencing a prosecution. *People v. Pankey*, 94 Ill. 2d 12, 16 (1983). In the absence of an indictment or information, the prosecution cannot be said to have commenced. Only when the criminal prosecution has commenced are the protections of speedy-trial clause of the sixth amendment (U.S. Const. amend. VI) available to a defendant. *Marion*, 404 U.S. at 313. Thus, an arrest, without the subsequent commencement of a prosecution, will not trigger the constitutional speedy-trial protections, but instead will be analyzed under the *Lawson* due-process framework.

¶ 105   *People v. Townsel*, 2018 IL App (2d) 160612, similar to *Pankey*, instructs that a prosecution commences upon the official and deliberate charging of the defendant with an offense. *Id.* ¶ 8. In that case, the defendant challenged the efficacy of a complaint to initiate a felony prosecution for the purposes of a consecutive-sentencing provision. We held that the filing of the complaint formally charged the defendant notwithstanding the fact that a superseding indictment was filed later. *Id.* Here, while defendant was arrested on the same day as Clark's murder, and while there was probable cause to believe defendant had committed an offense, there was no formal charge until the April 16, 2014, indictment of defendant. Again, because no prosecution had commenced (*Pankey*, 94 Ill. 2d at 16; *Townsel*, 2018 IL App (2d) 160612, ¶ 8), the analysis of the

effect proceeds under the *Lawson* due-process framework. See also *People v. Johnson*, 2015 IL App (4th) 130968, ¶ 21 (an appearance bond is not a charging instrument).

¶ 106 Even if the *Barker* factors applied, except for the length of the delay, they cut against defendant or are manifestly inappropriate to the circumstances. Obviously, the length of the delay between arrest and indictment is extremely lengthy, but to make the statement illustrates its inapplicability. See *Silver*, 376 Ill. App. 3d at 783. The reasons for the delay were never articulated. On the other hand, they were not required to be articulated under the proper analysis, so we deem the factor inapplicable. Defendant never asserted his speedy-trial right in this matter prior to the indictment. Again, making the statement illustrates its inapplicability because it is axiomatic that, until the prosecution is initiated, a defendant cannot assert his or her right, statutory or constitutional, to a speedy trial. We deem this factor inapplicable. Last, prejudice, as discussed above, cuts against defendant, because he showed only the possibility of prejudice and not actual and substantial prejudice. This factor weighs in favor of the State. Thus, because the prejudice factor is the only factor the application of which is not nonsensical, the *Barker* factors, insofar as they are relevant, weigh in favor of the State and against defendant. Accordingly, we reject defendant's invitation to transform the analysis of preindictment delay into one of constitutional speedy-trial delay which, to the extent applicable, nevertheless weighs against defendant.

¶ 107 Defendant argues that we should follow the guidance of *Kilcauski*, 2016 IL App (5th) 140526. *Kilcauski*, however, is distinguishable on at least two important bases. First, and most importantly, *Kilcauski* analyzed the delay issue along the constitutional speedy-trial/*Barker* pathway. *Id.* ¶¶ 24-36. For the reasons thoroughly discussed above, that analytical pathway is inappropriate to the circumstances of this case.

¶ 108 The second basis is that the unusual and unique factual circumstances of *Kilcauski* render it distinguishable from this case. In *Kilcauski*, in July 2013, the defendant was arrested in Illinois and held in Illinois. *Id.* ¶ 3. Sometime before August 2013, defendant was delivered to Missouri. *Id.* ¶ 5. The trial court determined that the transfer to Missouri had occurred without the completion of process to do so by the county and deemed that, because the defendant had neither posted bond nor escaped, the defendant was still in the county's custody. *Id.* ¶ 6. A few days later, the defendant filed a *pro se* motion for a speedy trial. *Id.* ¶ 8. In July 2014, the State filed an indictment against the defendant. *Id.* ¶ 9.

¶ 109 The appellate court held that the defendant remained in the State's custody because he had never been released from the county's custody even as he was being held in Missouri. The court then embarked on the speedy-trial/*Barker* analysis. *Id.* ¶¶ 28-30.

¶ 110 Unlike *Kilcauski*, defendant here was taken into custody following Clark's murder, but then his bond was revoked, and defendant was then in custody on the burglary conviction until the indictment was filed. The fact that defendant was properly in custody on the burglary charge serves to distinguish this case from *Kilcauski*, where the defendant was at all times deemed to be in custody on the charges for which he was eventually indicted. Thus, the issues underlying the *Barker* line of analysis were more directly in play in *Kilcauski*, where, here, it is inappropriate to analyze the delay under *Barker*. Accordingly, we reject defendant's invitation to follow *Kilcauski*.

¶ 111 Accordingly, for the foregoing reasons, we affirm the trial court's judgment on the issue of preindictment delay.

¶ 112                          B. Public Defender's Office Conflict

¶ 113   Defendant next contends that the trial court erred in failing to grant the public defender's office's several motions to withdraw as well as his various *pro se* motions to disqualify the office. Clark had been appointed as conflict counsel in the burglary case in *Wanke I*.  At the most basic level in defendant's motions to disqualify, defendant reasoned that, because he had already been appointed conflict counsel for a prosecution occurring in the circuit court of Winnebago County, he should also have received conflict counsel rather than counsel from the pubic defender's office in this case.  In addition, defendant's *pro se* motions seized upon the rationales of the motions to withdraw of the public defender's office.  The public defender's office's motions argued that conflicts precluded the office as a whole from effective representation of defendant and generally identified members of the office who had participated in the Clark murder investigation (O'Connor) or supervisors who believed themselves to be conflicted (Sorensen and Doll).[6]  While the sauce-for-the-goose argument has no small measure of surface appeal, it is devoid of actual legal analysis of whether the public defender's office was afflicted by a conflict.  We therefore address the issues apparent in the record after first discussing the applicable principles and standard of review.

¶ 114   There are two categories of conflict of interest: *per se* and actual.  *People v. Fields*, 2012 IL 112438, ¶ 17.  A *per se* conflict is based on facts about the attorney's status.  *Id.*  We note that defendant concedes that he is not contending that the public defender's office was *per se* conflicted. We accept that concession and note that, while O'Connor was *per se* conflicted by virtue of her

_____

[6] Perri's motion to withdraw was purely a personal motion to withdraw and did not allege the existence of any office-wide conflicts.

participation in the State's official actions investigating Clark's murder, that conflict cannot be imputed to the public defender's office as a whole. See *People v. Cole*, 2017 IL 120997, ¶¶ 34-35 (reaffirming the long-standing principle that a public defender's office, unlike a private law firm, is not conflicted out because one member, even a supervisor, experiences a conflict).

¶ 115 By contrast, an actual conflict appears to refer to any conflict that is not deemed a *per se* conflict. See *Fields*, 2012 IL 112438, ¶ 17. Two lines of analysis have developed to analyze an actual conflict, depending upon whether the defendant informed the court of the conflict. *People v. Spreitzer*, 123 Ill. 2d 1, 17-18 (1988). In the first instance, the defendant or the defense has informed the trial court at an early stage in the proceedings of a potential or possible conflict. *Id.* at 18. In that instance, the court is under a duty to either appoint separate counsel or to take adequate steps to determine whether the risk of conflict is too remote to warrant appointing separate counsel. *Id.* (citing *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978)). If the trial court does not take the appropriate steps, the defendant may be deprived of his right to counsel as a result of the conflict, and the reversal of the defendant's conviction does not require that the defendant show actual prejudice, meaning that the attorney's actual performance was affected by the conflict. *Id.*

¶ 116 In the second line of analysis, neither the defendant nor the defense informed the trial court about the possible or potential conflict. *Id.* In that instance, the defendant must show that an actual conflict of interest adversely affected counsel's performance. *Id.* In other words, the defendant must indicate some specific defect, attributable to the conflict, in his or her counsel's strategy, tactics, or decision making, in other words, the defendant must demonstrate actual prejudice. *Id.* However, while showing the existence of actual prejudice, the defendant need not prove that his

or her attorney's shortcomings did not constitute harmless error. *Id.* at 18-19. In other words, the defendant is not required to prove that the conflict contributed to his or her conviction. *Id.* at 19.

¶ 117 The parties disagree about the standard by which we are to review this issue. Defendant asserts that our review is *de novo*, citing *Fields*, 2012 IL 112438, ¶ 19. *Fields*, however, expressly and specifically linked the *de novo* standard of review with the consideration the lower court's finding of a *per se* conflict. Here, defendant has conceded, properly, that any conflict here is an actual conflict and not a *per se* conflict, so the *de novo* standard of review would not seem to apply. For its part, the State asserts that the standard of review should be abuse of discretion, "because the facts in this case are at issue." The State, however, provides no authority to support its assertion and, in any event, factual issues usually implicate the manifest-weight-of-the-evidence standard of review. *E.g.*, *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8. This standard seems to understate the scope of our task, however. In our view, we are reviewing the application of the law to the facts determined by the trial court, much like a motion to suppress. We therefore will reject the trial court's factual determinations only if they are against the manifest weight of the evidence, and we will review *de novo* the trial court's conclusions as to whether the facts satisfy the legal standard. *People v. Johnson*, 237 Ill. 2d 81, 88-89 (2010).

¶ 118 With these principles in mind, we must decide which line of analysis applies to the facts before us. The record clearly shows that both defendant and his counsel repeatedly and at an early stage in the proceedings brought before the trial court the issue of the potential or possible conflicts of the public defender's office. This would place us in the first line of analysis where the trial court is under the duty either to appoint separate counsel or to take the necessary steps to determine if the potential or possible conflict is too remote to warrant appointing separate counsel. It is also

manifestly apparent in the record that the trial court held a hearing each time defendant or counsel raised the issue of potential or possible conflicts in the public defender's office. Based on this understanding, defendant's argument becomes whether the trial court correctly ascertained the existence of potential or possible conflicts from the facts presented. With this understanding of defendant's argument, we address his contentions.

¶ 119   Defendant argues that Clark's close ties to the public defender's office and to the public defender Sorensen and then Doll as well as other supervisors in the office so poisoned the office that effective representation by the individual assistants was impossible. Among the documents cited by defendant to support this contention was Perri's motion to withdraw. However, Perri made it clear that he was withdrawing only on his own, personal behalf. Therefore, we do not believe that Perri's motion can stand as a proxy for the entire office. We also note that defendant's trial counsels, Zimmerman and Simmons, both indicated that, while they were concerned about the issue, they believed that they could effectively and did effectively represent defendant. The record supports their representation. Accordingly, we will not consider Perri's personal motion to withdraw as representing the attitude of the office as a whole, only Perri's own personal beliefs and attitude.

¶ 120   Defendant notes that Sorensen attended grade school and high school with Phyllis Clark and high school with Clark. Clark and his son-in-law attended various of the office's social functions and Clark's family maintained their social connections with the public defender's office. Defendant argues that the supervisory roles of Sorensen and Doll, who both were excused by the trial court from representing defendant, would have chilled or inhibited the assistant public defenders that they supervised and deprived defendant of effective conflict-free representation.

This argument is a variant on the idea that the conflict of one member of the public defender's office, even if a supervisor, is imputed to the entire office. This argument is incorrect as a matter of law. *Cole*, 2017 IL 120997, ¶¶ 34-35.

¶ 121    Moreover, the trial court heard argument regarding Sorensen's childhood experiences of going to school with Clark and his wife and held that the connection was too tenuous to support a conflict even if it permitted Sorensen to be excused from personally representing defendant. We cannot say that this determination was against the manifest weight of the evidence. In a small legal community, it is likely that many members will have numerous social interactions and develop professional relationships. To extrapolate a conflict simply on the basis of social and professional relationships, particularly where, as here, the victim was an experienced and long-serving member of the legal community would disrupt the ability of the State, through each county's public defender's office, to represent indigent citizens and devastate the county's finances. Something more substantial is needed.

¶ 122    It is illuminating to compare Sorensen's situation with Perri's personal conflict. Sorensen had grown up with Clark's wife and Clark, attending the same schools. By contrast, Perri alleged that his ties with Clark went beyond shared childhood educational experiences—Clark was a mentor and someone who influenced and assisted his legal career. Perri admired Clark and sought his counsel and advice. This suggests a much closer and significant relationship that poisoned Perri's ability to represent Clark.

¶ 123    It is significant that defendant and counsel alleged only the expected professional interactions between Clark and Sorensen and members of the public defender's office. Particularly, defendant did not allege that Sorensen was a close friend of Clark or Phyllis Clark.

Likewise, the other members of the office were not alleged to be close friends or to have any specific ties to Clark or Henbest. By contrast, Perri, in his personal motion to withdraw alleged precisely the sort of relation and personal and professional influence with Clark that is lacking with respect to the allegations regarding Sorensen and the other members of the public defender's office.

¶ 124 Defendant asserts that the senior members of the office "viewed this case as one involving the murder of their close friend and colleague, and father-in-law to another of their close friends." The support for this assertion comes not from the trial court's factual determination but from Perri's motion to withdraw. While we can say that the quoted passage from defendant's brief applies to Perri, there is no evidence that the members of the office felt the same way. Defendant points to Schmidt's motion to withdraw on behalf of the office in which Schmidt alleged that he could not discuss the case with his colleagues in the office because he believed that many of them believed that defendant was guilty of the Clark murder, but he did not know which of the assistants felt that way. The trial court noted, correctly, that there was no authority for the proposition that an assistant public defender had to be able to discuss an assigned case with others in the public defender's office not assigned to the case. Moreover, the trial court determined that neither Schmidt nor his co-counsel at the time were conflicted, and they could discuss the case amongst themselves. We cannot say that this determination was against the manifest weight of the evidence.

¶ 125 Defendant points to his *pro se* "motion to compel" in which he alleged that the public defender's office's investigator refused to investigate purportedly exculpatory evidence, believed that defendant was guilty of the offense, and expected the office to be removed from the case. The

problem here is that the trial court allowed the so-called motion to compel to be filed, but, as defendant was represented by counsel at the time, did not consider it. While it is part of the record on appeal, the trial court was correct in its determination that it was without effect and could not be considered. The motion to compel did not claim that counsel was ineffective or seek to disqualify the public defender's office due to a potential or possible conflict. It was a motion filed by defendant in the apparent belief that he could both have the representation of the public defender's office and still act as the office's co-counsel in his own case. This belief is erroneous, and we cannot accept defendant's arguments based on his allegations in the motion to compel as this was never properly before the trial court and is not properly before us despite its presence in the record. *People v. Flynn*, 341 Ill. App. 3d 813, 821 (2003) (it is well established that a defendant may not engage in a hybrid representation in which he simultaneously proceeds *pro se* and is represented by counsel). We therefore hold that the trial court's determination that the motion to compel was not to be considered was neither against the manifest weight of the evidence nor erroneous as a matter of law. *Id.*

¶ 126 Defendant's general proposition appears to be that the emotional nature of the offense, which saw a long-serving and well-regarded member of the defense bar gunned down in his driveway, was so emotionally horrifying, that no member of the public defender's office could be expected to serve the accused's interests effectively and zealously. We disagree. Many crimes are horrific and emotionally taxing. That does not upset the principle that a lawyer is expected to serve the interests of his or her client alone. Defendant has not demonstrated some fact indicating a particularly close connection between any of the individuals engaged in his representation (Schmidt, Zimmerman, Simmons) and Clark. Likewise, the trial court determined there were no

facts presented that demonstrated such a conflict, and this determination was not against the manifest weight of the evidence. We therefore reject defendant's contention.

¶ 127 Defendant argues that O'Connor, who was an assistant State's attorney at the time of the offense, is conflicted and her conflict should be imputed to the office. As noted above, the conflict of a member of a public defender's office is not routinely imputed to the office. *Cole*, 2017 IL 120997, ¶¶ 34-35. The trial court properly determined that O'Connor was individually under a *per se* conflict by virtue of participating in the investigation on behalf of the State. Beyond the speculation that O'Connor's status as a colleague in the office might inhibit fully adversarial cross-examination if she were called as a witness, defendant can point to nothing in the record to show that O'Connor's conflict somehow would infect the office. Defendant insists that O'Connor's participation in the bond revocation in the burglary case was relevant here. The trial court adjudicated the issue and determined that the bond revocation had been fully litigated in *Wanke I* and was not relevant here. We agree. In any event, O'Connor never appeared in this case a witness, so any concerns regarding the inhibitions of her colleagues in cross-examining a senior member of their office did not come to fruition and cannot be the basis of a finding of a conflict. We reject defendant's argument.

¶ 128 Defendant insists that O'Connor's participation in the grand jury convened in this matter shortly after the offense was not investigated and speculates that there is no way to know why Zimmerman and Simmons did not challenge that conduct. Simply stated, counsel did not challenge the conduct because it was not deemed to be relevant and the trial court expressly held so. We cannot say the trial court's determination of irrelevance was erroneous.

¶ 129   Defendant last contends that unknown members of the public defender's office aided the official investigation against him.  Defendant refers to one assistant public defender informing the police that the assistant's client had information on the Clark murder and was willing to share it with police.  This appears to be nothing more than the assistant zealously representing his or her client even while the State was involved in an investigation of defendant, who ultimately was represented by the same office.  This is not uncommon and does not result in the disqualification of the public defender's office as a whole.  *Cole*, 2017 IL 120997, ¶¶ 34-35.  Moreover, there has been no suggestion that any of the attorneys who represented defendant represented the jailhouse informant.  Accordingly, we reject defendant's contention.

¶ 130   For the reasons above, therefore, we hold that the trial court correctly determined that none of the circumstances presented an impermissible potential or possible conflict.  We therefore conclude that the trial court did not err in denying the various motions to withdraw on the part of the public defender's office or defendant's various motions to disqualify the public defender's office.

¶ 131                      C. Prior Consistent Testimony

¶ 132   Defendant next argues that the trial court improperly allowed the State to bolster its eyewitness testimony with their prior consistent statements under the guise that they were statements of identification.  Defendant argues that the sheer volume of the purported identification testimony, 35 instances by his count, tipped the scales in what was otherwise a closely balanced circumstantial case.

¶ 133   Generally, the admissibility of evidence is within the discretion of the trial court, and we will not reverse the trial court's judgment absent an abuse of discretion.  *People v. Nelson*, 2019

IL App (2d) 161097, ¶ 11. An abuse of discretion occurs where the trial court's judgment is arbitrary, fanciful, or unreasonable, or constitutes an error of law. *Id.*

¶ 134 Defendant argues that the State used evidence of prior consistent statements masquerading as identification testimony to improperly bolster the testimony of its eyewitnesses. Generally, a party may not bolster the testimony of its witnesses on direct examination by introducing the witness's prior consistent statements. *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 37. However, section 115-12 of the Criminal Code of 1963 (Code) (725 ILCS 5/115-12 (West 2016)) provides: "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." Statements fitting into this exception are admissible as substantive evidence. *Anderson*, 2018 IL App (1st) 150931, ¶ 37. There does not appear to be any dispute that the eyewitnesses testified at trial and were subject to cross-examination. The issue, then, is whether the challenged statements were statements of identification under section 115-12.

¶ 135 While such statements are defined broadly to encompass the entire identification process, that does not give the proponent *carte blanche* to introduce every conversation between a witness and a police officer. *Id.* ¶ 38. Rather, the testimony admitted under this exception must be limited to those statements pertaining to the identification of a person after perceiving him. *Id.*

¶ 136 Likewise, Rule 801 provides that a statement is not hearsay if, "[i]n a criminal case, the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement," and the statement is "one of identification of a person made after perceiving the person." Ill. R. Evid. 801(d)(1)(B) (eff. Oct. 15, 2015). The rules of evidence were meant to

codify existing Illinois law, and particularly, Rule 801(d)(1)(B) was a codification of section 115-12 of the Code. *People v. Temple*, 2014 IL App (1st) 111653, ¶ 46.

¶ 137 Defendant challenges the State's utilization of the eyewitness testimony about what they observed, then the testimony of what the witness told the police, and then the police witnesses testifying about what they were told by the eyewitnesses. As an example, defendant highlights the testimony of Ingvar Carlson, in which he testified about observing the blue van driving toward the scene of the shooting a few minutes before the shooting occurred. Carlson identified a picture of the van as the van he had observed. Carlson also testified that, later in the evening of the shooting, he was shown the van depicted in the picture and identified it as the van he had seen despite some initial hesitation. Carlson testified that five days after the shooting, he gave a statement to the police in which he stated that the van he had been shown in the evening after the shooting was the van that he observed a few minutes before the actual shooting. A police witness also testified that he showed Carlson the van and received an identification from Carlson, who was not positive in his identification. Finally, a second police witness testified that he took Carlson's written statement in which Carlson stated that the van depicted in the picture shown at trial was the van he had seen earlier.

¶ 138 Similarly, defendant highlights the testimony of Peter Kruchten who identified both the van and gave a description of the driver. Kruchten went through his observation of the van, identified the State's exhibit, described his interaction with a police officer on the scene, and his show-up identification of the van. Likewise, police officers testified about their interactions with Kruchten at the scene, his description of the van, and the show-up identification procedure and identification.

¶ 139   Kruchten also went through the same testimonial process regarding his observations of the van's driver.  He testified about what he observed and what he related to the police.  Kruchten testified that, a few days after the shooting, he saw a newspaper picture with defendant's picture and identified it as being of the driver to the police.  Police witnesses testified about the descriptions they received from Kruchten and his later identification from the newspaper picture.

¶ 140   Defendant contends that, in the case of each of the eyewitnesses, the State followed essentially the same procedure of the eyewitness identifying the exhibit, the eyewitness explaining his or her observations to the police, and the various police officers testifying about receiving the descriptions and the statements from the eyewitnesses.  Defendant argues that this process resulted in little more that the introduction of the witnesses' prior consistent statements which improperly bolstered the testimony of the witnesses and, by sheer dint of the repetition, served "establish" as fact that which had been repeated over and over.  Defendant argues that this constituted reversible error.

¶ 141   Defendant attempts to frame the issue as one involving prior consistent statements.  Prior consistent statements are generally inadmissible except to rebut a charge or inference that the witness is motivated to testify falsely or his or her testimony was recently fabricated.  Ill. R. Evid. 613(c) (eff. Oct. 15, 2015); *People v. Williams*, 147 Ill. 2d 173, 227 (1991).  Defendant argues that, as prior consistent statements, the complained-of testimony was inadmissible, and no charge of improper motive or recent fabrication was made or inferred.  Thus, the prior consistent statements had the effect of repeating testimony to the jury until the jury took it as fact simply by dint of repetition.

¶ 142 While we understand defendant's concern, we believe that the proper characterization of the eyewitnesses' testimony is identification testimony. We note that, in *Temple*, 2014 IL App (1st) 111653, the court endorsed the same procedure utilized in this case as being fully proper under the common law of statements of identification, section 115-12 and Rule 801(d)(1)(B). *Id.* ¶¶ 41-42, 46. In that case, the State had the witnesses explain the process of their identification, including a vehicle, what the witnesses told the officers, and then had the police testify as to their interactions with the witnesses. *Id.* ¶¶ 41-42. The court analyzed *People v. Tisdel*, 201 Ill. 2d 210 (2002), *People v. Shum*, 117 Ill. 2d 317 (1987), and *People v. Newbill*, 374 Ill. App. 3d 847 (2007), in determining that the entire identification process comes under the exceptions to the rule against hearsay carved out in section 115-12 and Rule 801(d)(1)(B). *Id.* ¶¶ 34-42. Beyond the fact that, in *Temple* there were only three eyewitnesses and here there were eight, we see no significant difference between the cases that would suggest that *Temple* should not guide our decision. Accordingly, we follow *Temple* and hold that the objected-to testimony was properly admitted as the identification-testimony exception to the rule against hearsay. The trial court, therefore, did not abuse its discretion in allowing the testimony.

¶ 143 Defendant argues that the objected-to testimony was simply the improper bolstering of prior consistent statements. We note that the purpose of allowing witness testimony about the full identification process is to allow the trier of fact to be fully informed about the reliability of the witness's identification and the elements of suggestiveness or lack of suggestiveness in that process. *Id.* ¶ 37 (quoting *Tisdel*, 201 Ill. 2d at 219). Defendant's contention misses the mark because it fails to note that the testimony concerned the actual identification and observations of the van, the driver, and the circumstances regarding its reliability and the suggestiveness in that

process. Section 115-12 and Rule 801 have simple prerequisites: the declarants testified at the trial and they were all subject to cross-examination. 725 ILCS 5/115-12 (West 2016); Ill. R. Evid. 801(d)(1)(B) (eff. Oct. 15, 2015). In addition, the statement must be one of identification made after perception. *Id.* While defendant's concern is about the repetitiveness of the testimony concerning the identification process, it fails to address how the objected-to testimony failed to satisfy the requisites of the statute or the rule. Noting that the statements of identification were repetitive does not transform them into prior consistent statements. We reject defendant's invitation to reframe the issue.

¶ 144 Defendant suggests that the recent enactment of the Illinois Rules of Evidence abrogated any common-law authority accepted prior to the enactment of the rules. This argument is incorrect. The enactment of the rules was meant to codify the common law, not supplant it. *Temple*, 2014 IL App (1st) 111653, ¶ 46.

¶ 145 Defendant argues that the policy behind the prohibition against prior consistent statements differs from that behind identification testimony. Defendant contends that in the case of prior consistent testimony, the harm to be avoided is the acceptance by the trier of fact of oft-repeated evidence; by contrast, the harm to be avoided by an exception to the rule against hearsay, like the identification-testimony exception, is unreliability. While we accept this proposition, defendant fails to grapple at all with why the objected-to testimony is not identification. Instead, defendant focuses solely on its repetitive nature and miscategorizes it as prior consistent testimony. Properly viewed, the testimony is identification testimony, as each witness described his or her observations, including the police who interacted with the eyewitnesses. See *id.* ¶¶ 41-42.

¶ 146  Accordingly, for the foregoing reasons, we hold that the trial court did not abuse its discretion in admitting the identification testimony.

¶ 147                         D. The State's Closing Arguments

¶ 148  Defendant argues that the State's closing arguments were improper because they were not based on evidence and misstated evidence to his prejudice.  However, defendant did not object at trial to any of the remarks raised here, so they are forfeited.  *People v. Camacho*, 2018 IL App (2d) 160350, ¶ 37 (to preserve a claimed error, the defendant must both object at trial and raise the claimed error a posttrial motion).  Defendant, however, contends that we should review the claimed errors under the plain-error rule.  Alternatively, defendant contends that counsel provided ineffective assistance by failing to object to the errors at trial and for failing to include them in his posttrial motion.

¶ 149  Plain error is a narrow means of avoiding forfeiture.  *Id.* ¶ 38.  Under the plain-error doctrine, a court can review unpreserved clear or obvious error when: (1) the evidence is closely balanced and the error threatened to tip the scales against the defendant; or (2) the error is so serious it challenges the fairness and integrity of the judicial process.  *Id.*  Our starting point is to determine whether there was reversible error in the first instance, because absent reversible error, there can be no plain error.  *Id.*

¶ 150  A prosecutor is allowed wide latitude in delivering closing arguments.  *Id.* ¶ 39.  The prosecutor may comment on the evidence and any reasonable inference arising from the evidence.  *Id.*  When reviewing a closing argument for error, we consider the argument as a whole rather than focusing on a few select remarks.  *Id.*  For a court to find reversible error based on closing

arguments, the defendant must identify those remarks that were both improper and so prejudicial that justice was denied or that the verdict of the jury may have been caused by the error. *Id.*

¶ 151 Here, defendant identifies the State's motive argument as not being based on the evidence and hence, an unreasonable inference. Defendant also identifies a number of purported factual misstatements which tended to paint an erroneous picture of the circumstances of the offense and to lead the jury inexorably and mistakenly to the conclusion that he was guilty. We begin with defendant's contention about the motive argument.

¶ 152 According to defendant, the State's motive argument was that he wished to remove Clark from the case even to the point of murdering him. According to the State, defendant's desire to remove Clark was inferential and arose out of the conflict and upset in their relationship caused by Clark's representation and defendant's disagreements with Clark. We have carefully reviewed the evidence and the arguments and cannot say that the motive presented by the State was not a reasonable inference. Zerouali testified that, as the burglary case progressed, she observed the two men becoming tenser in each other's presence. Toward the end, both were cutting the other off and speaking over the other. The State also introduced portions of pleadings filed by defendant which discussed Clark's perceived shortcomings in harsh and forceful terms. In addition, we note that, the day before the originally scheduled sentencing hearing in *Wanke I*, someone took a potshot at Clark as he was taking out the garbage. Two days before the rescheduled sentencing hearing, in the midst of a severe winter storm that had shut down the City of Rockford, someone using the same gun as before shot and killed Clark. The scientific evidence established that it was the same gun used each time, so the inference reasonably arises that it was also the same person each time. The timing of the shootings, although circumstantial, also leads to the reasonable inference that it

was defendant who would have been most interested delaying the sentencing, particularly as he was released on bond at the time. Finally, the web of circumstantial evidence from the identification of the vehicle to the consistent description of the driver, to the eventual identification of a picture of defendant by the witnesses who testified that they had observed the driver suggest that it was indeed defendant who committed the offense. Attempting to explain why, the State inferred it was because defendant wanted to remove Clark from the case and was out of options to do so in any other fashion. Based on the totality of the closing arguments and the evidence admitted, we hold that this was neither an unreasonable inference nor that it was not based on the evidence admitted at trial. Accordingly, there was no error accruing from the State's remarks about the motive.

¶ 153 Defendant also contends that the remarks that defendant was the only person in the world who was trying to remove Clark from his case were also unmoored from the evidence and erroneous. We view these remarks as the other side of the coin of the motive remarks. While categorical statements such as these are perhaps inherently fraught with the opportunity to overstate one's position thereby diminishing one's credibility with the audience, here, they are still supported by the extremely suggestive timing of the shootings, the ongoing nature of the case with defendant, the fact that Clark was both a general practitioner and a part-time conflict attorney, and the rocky and deteriorating relationship between the men. Thus, we hold that the inference was likewise reasonable and sufficiently based in the evidence.

¶ 154 Next, defendant identifies certain purported factual misstatements throughout the State's closing arguments. We preface our consideration by noting that the jury was instructed that the parties' arguments were not evidence and that the jurors were to rely on their own recollection of

the evidence, not the statements of the attorneys. As an initial pass, therefore, the jury was administered an appropriate curative instruction that presumptively inoculated it against heeding the purported factual misstatements made by the prosecutors. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 49 (the jury is presumed to follow its instructions; the instruction that closing arguments are not evidence greatly diminishes any possible prejudice cause by improper remarks in closing argument).

¶ 155 Defendant first notes that, in the initial closing argument, the prosecutor stated that Christopher Pro provided the same description of the driver of the van—middle aged, glasses, grayish hair, scruffy beard—as the other witnesses who testified that they had observed the driver. However, Pro also testified that he was focusing entirely on the van to make sure it would not collide with his car, so he did not observe the driver. We agree that this statement was factually incorrect. Based on the jury instructions, however, any error, given that it was an isolated misstatement by this prosecutor, was likely minimal and certainly was not prejudicial.

¶ 156 The same prosecutor also argued that all of the computers seized in this matter "went dark" from 11 a.m. to 5 p.m. Defendant argues that this misstatement was prejudicial because it expanded the window of time in which defendant could have committed the crime and returned to where he was next observed. We disagree with defendant's conclusion. We note that the statement is factually inaccurate. However, we also note that immediately after making the inaccurate statement, the prosecutor remarked that the shooting occurred at 1:54 p.m., and the phone was used at defendant and Chavez's residence placing a call to Chavez 21 minutes later. Thus, notwithstanding the inaccuracy, the prosecutor did not expand the time window to six hours, rather, he limited it to 21 minutes. Thus, defendant's contention that the prejudice accruing from the

erroneous comment was the expansion of the time window is without merit. As well, the jury instructions served to diminish any possible prejudice. In light if the inconsequential nature of the inaccuracy, we cannot say that the error was prejudicial.

¶ 157 Next defendant consolidates two separate statements by the prosecutor during the State's rebuttal closing argument to assert that Clark's only legal business was Clark's sentencing, both on November 5, 2007, and on February 8, 2008. Turning to the first remark, the prosecutor argued: "Two days before Mr. Clark was to appear and represent the defendant at the sentencing, he is murdered in his front yard, clearing the walkway. One day before the original sentencing date, November 5, Mr. Clark is shot at while he takes garbage out to the curb." In the next remark, the prosecutor argued:

> "Each time there was an attempt on Mr. Clark's life, the defendant was on notice that Mr. Clark was not getting off his case. The first attempt, November 4th. If at first you don't succeed, try, try again. And he tried again February 6th, and that time he succeeded. He took the opportunity of the courthouse being closed. Knowing that, Mr. Clark had no legal business that day in the courthouse because it's closed. He knew that. It's shut down."

¶ 158 Based on these remarks, defendant argues that:

> "There was no evidence of what other cases Clark had scheduled on February 6-8, and it strains credulity to suggest that a working attorney had zero cases scheduled for two consecutive days and a single case scheduled for a third day. Furthermore, since the defendant's case was not scheduled for February 6, there was no evidence that the defendant knew the courthouse was closed that day. Finally, there was certainly no

evidence that the defendant had any idea whether Clark had any other legal business on that day. The prosecutor invented all of those claims to suggest the defendant's strategy for killing Clark."

¶ 159 Defendant's argument misconceives the import of the prosecutor's remarks. The first remark obviously refers to February 6, 2008. Thus, the prosecutor argued that, because of the snowstorm shutting down the city, Clark had no legal business to attend to at the courthouse. The prosecutor further implies that, because the city was shut down, Clark did not have legal business at his office. Given the fact that Clark stayed home, this was a reasonable inference to convey. Likewise, the second passage also obviously refers to February 6. The prosecutor again suggests that defendant took advantage of the winter storm to find Clark in an isolated position, such as at home, rather than in a public and crowded space, such as the courthouse. While it is true that the jury did not have a full picture of what other cases occupied Clark's calendar around the dates of the shootings, the contention is a red herring. The prosecutor's remarks conveyed the reasonable inference that defendant seized an unexpectedly presented opportunity. We find no factual inaccuracy with these statements and determine that defendant's reading of the prosecutor's remarks is untenable.

¶ 160 Defendant next raises the prosecutor's statement in rebuttal closing argument that Smith called the police to notify them that he had discovered a bag of wet clothes in his basement. This remark is factually incorrect. The bag of wet clothes was discovered during the police search of Smith's home pursuant to a warrant. In fact, Smith called the police several days after the search to report that he had discovered items in his garage he believed to be from Chavez's van. Defendant argues that, by conflating the discovery of the bag of wet clothes with Smith's call to

the police about the items in the garage, the prosecutor implied that it was unusual and suspicious for defendant to wash his clothes at Smith's house.

¶ 161 The prosecutor actually remarked, "Well, who's doing laundry in the middle of a blizzard, not at your own house? And so he leaves this bag of clothing there, washes everything." The statement, properly read, implies that it is odd for a person to leave his or her house in the middle of a blizzard to travel to another's house simply to do laundry.[7] Defendant then suggests "that the same grand jury testimony the State used as evidence that the defendant told Smith he had done his laundry also contained Smith's explanation that it was common for the defendant and Chavez to do their laundry at his house." However, whatever defendant is referring to was not entered into evidence. The portion of the grand jury testimony explaining that defendant commonly did his own laundry at Smith's home was never discussed during Smith's testimony, either by the State or by the defense. Moreover, Smith testified that it was common for Chavez to visit on Sunday mornings, prepare breakfast for Smith and herself, and to do her laundry. Smith testified that the Sunday visits were "[their] time," and defendant did not participate in those visits. Thus, the actual inference from the evidence in the record and before the jury was that it was common for Chavez to do her laundry at Smith's house, but no mention was made of defendant other than, on the day of the murder, he used Smith's washer. Thus, even under defendant's argument, there was nothing improper about attempting to suggest that it was unusual for defendant to do laundry at Smith's

---

[7] We also note that, factually, the fact that defendant apparently placed wet or damp clothes into a garbage bag and left the bag in an obscured location behind boxes in Smith's basement compounds the oddness commented upon by the prosecutor.

house because there was no evidence presented that defendant customarily or regularly did laundry at Smith's house.[8] Accordingly, the misstatement was inconsequential and defendant's argument itself is not based on the record.

¶ 162 Defendant next argues that during the rebuttal closing argument, the prosecutor improperly argued that, while the four eyewitnesses failed to identify defendant in the photo lineups they were shown on the evening of the offense, "they all 'said' that his hair and beard matched those of the driver of the van." Defendant concludes that this purported misstatement prejudicially told the jury that the eyewitnesses had identified the defendant's physical characteristics as matching those of the van's driver.

¶ 163 We quote the portion of the argument to which defendant refers:

"This is the jacket he had on. That picture was taken that evening after he was taken into custody. There's no speculation there.

And, you know, he looks very different without his glasses. And the witnesses were asking about the glasses. And they said, *Scruffy beard. Yeah, that's here. Straggly hair. But he had glasses on.*

Why do you think he took them off? And he didn't take them off till he got to the police station. Because you know he had them on because the officers saw him with the glasses. He took them off because he thinks he's smarter than everybody else and he knew they were gonna be photographing him and showing that picture to the witnesses who saw

---

[8] Defendant does not allege that counsel was ineffective for failing to establish that he customarily or regularly did laundry at Smith's house.

him in the neighborhood, who would recognize him—because he didn't belong there. He was a stranger; he didn't live there.

So a few days later these smart and good neighbors see this picture. It's him. They're the ones calling the police; the police aren't calling them. They are on the phone, fast dialing—whatever—contacting the police, telling them, 'That's the man.'

And who is the man? It's the defendant (indicating)."

¶ 164 We cannot say that the record supports defendant's argument. Defendant argues that the prosecutor erroneously implied to the jury that the eyewitnesses "said" to police that defendant's physical characteristics matched those of the driver of the van. Instead the argument explains why defendant was not identified in the photo lineups shown to the eyewitnesses: he had taken off his glasses. Moreover, the record shows that the eyewitnesses' testimony about the driver similarly described the driver as being a middle-aged, white male with straggly hair and scruffy facial hair. While the prosecutor employed the word "said," defendant is incorrect regarding the thrust and effect of the argument. The remarks neither misstated the evidence nor raised unreasonable inferences from the evidence. Finally, the jury instructions made it clear both that the argument neither was evidence nor was the jury to accept as fact statements that were not borne out by their recollection. Accordingly, we do not believe there was any error accruing from these remarks.

¶ 165 Next defendant argues that the prosecutor misstated the evidence by stating that the neighbors "were the ones calling the police; the police [were not] calling them." Again, this was factually inaccurate, but the point appears to be wholly collateral and the distinction of whether the neighbors reached out upon seeing the newspaper picture versus informing the police that they had made an identification at the scheduled follow-up meeting appears to exalt the process of the

investigation over the substance. As noted, the jury instruction minimized any possible error, and we believe that the misstatement concerns only a minimal procedural point and was extraordinarily unlikely to cause any prejudice whatsoever.

¶ 166    The final set of remarks defendant challenges concerns the prosecutor's statements that the eyewitnesses identified defendant as the person they had seen " 'running to the van' " immediately after the shooting. Defendant argues:

"Those were blatant misstatements of the testimony. Three witnesses saw a person near the van in the immediate aftermath of the shooting. (Citation.) None of them identified the defendant as that person. None of them even described that person except Phyllis Clark, who was impeached with her prior statement that the person was five feet, seven inches tall. (Citation.) The prosecutor simply invented eyewitness identifications and argued them to the jury. The prejudicial effect of such an argument is self evident."

¶ 167    The prosecutor's actual remarks do not support defendant's argument. In the first set of challenged remarks, the prosecutor stated:

"Nobody told them who to pick out. They recognized him because they had seen him. He's the man driving the van the day Mr. Clark is murdered. He's the man running to the van. He's the man in the neighborhood the day before Mr. Clark is murdered. They recognized him."

In the second set of challenged remarks, the prosecutor stated:

"And so I ask you if—if Counsel says these witnesses just collectively got together and wanted to help, what is their motive? What bias would they have against the defendant? They didn't know him. There's no evidence that they ever met him.

Their only motive, ladies and gentlemen, is to tell the truth about what they saw. That's their only motive. And they saw him. They didn't see anyone else running to that van. They saw the defendant. And that's what they told you, and that's what they told the police officers. And they recognized him, and they identified him.

And you don't have to speculate on anything because that's not what you're here for. All you have to do is consider the hard facts. The hard facts.

And their recognition identification of the defendant is a hard, cold fact because they were there, out and about, forced to be out in the snow. Some had to go to work, some had to go to doctors, some got off work early. But we know that traffic was moving, and we know that people were about."

¶ 168 In the first place, defendant very carefully limits his challenge to the "running-to-the-van" witnesses and ignores the witnesses who had other observations of defendant. The first passage, however, clearly refers to all of the witnesses who observed defendant, either running to the van, driving, or in the neighborhood. The second passage is directed at the motive to fabricate and, given the proximity to the first passage, the statement, "[t]hey didn't see anyone else running to that van," is a call-back to the first passage and shorthand to remind the jurors what had just been argued. In the totality of the argument and record, we do not believe that the prosecutor misstated the evidence or drew an unreasonable inference.

¶ 169 Defendant notes that Phyllis Clark, Ingvar Carlson, and Clara Arco did not identify the man running to the van. They nevertheless provided relatively consistent descriptions of the man running to the van. We note that Clark stated that the man was five feet, seven inches tall, whereas the other witnesses who observed the man's height described the man as being tall. In the other

respects, though, the descriptions meshed to a significant degree. Finally, other witnesses identified defendant as the driver even if the specific "man-running-to-the-van" witnesses did not identify defendant. Rather than "blatant misstatements of the testimony" the remarks, viewed as a whole and not in isolation, encompassed all of the identification testimony—those who saw a man running, those who saw a man driving, and those who saw a man in the neighborhood—and we do not believe that the blanket statement that "they" identified defendant is either a misstatement or unreasonable inference from the evidence despite the fact that the identification was not categorically accomplished across all the eyewitnesses. Accordingly, we do not believe that there was any error in these remarks, and certainly, there was no prejudice accruing from them.

¶ 170 In sum, there were seven instances of improper argument identified by defendant. Four of those instances contained minor and inconsequential factual inaccuracies that, in the totality of the argument in light of the record, could not and did not mislead the jury. This is especially so given the instructions to the jury. We hold, therefore, that, while defendant could have successfully objected to the factual inaccuracies, they were not prejudicial and did not cause or contribute in any discernable fashion to defendant's conviction.

¶ 171 Because there is no reversible error, there is no plain error. *Camacho*, 2018 IL App (2d) 160350, ¶ 38. Accordingly, the forfeiture of defendant's argument stands, and we continue to honor the procedural default.

¶ 172 Defendant seeks to evade the forfeiture by arguing that counsel was ineffective for failing to object or to raise the issue in his posttrial motion. To state a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that the deficient

performance prejudiced defendant. *People v Clendenin*, 238 Ill. 2d 302, 317 (2010). The defendant's failure to establish either prong is fatal to the claim. *Id.* at 318.

¶ 173 Here, defendant cannot establish prejudice. As explained above, the motive argument was not erroneous, and, therefore, by definition, was not prejudicial, and the factual misstatements were not prejudicial in light of the totality of the record and closing arguments, as well as the instructions given to the jury. Accordingly, we reject defendant's ineffective assistance claim.

¶ 174 For the foregoing reasons, therefore, we reject defendant's contentions regarding the State's closing arguments.

¶ 175                    E. *Krankel* Inquiry

¶ 176 Defendant last argues that the trial court erred in determining that, for purposes of his preliminary *Krankel* inquiry, he had not demonstrated the possibility that counsel neglected his case. Defendant argues that he demonstrated the possibility of counsel's neglect in three ways: first, for failing to object during closing arguments, second, for failing to call Chavez as a witness to prove, via ATM and parking-fine receipts, that she had been downtown and not in Clark's neighborhood the day before the shooting, and third, for failing to investigate other clients who were dissatisfied with Clark's representation. We address the issues in turn.

¶ 177 As a preliminary matter, when a defendant makes a posttrial allegation of ineffective assistance of counsel, the court is obligated to conduct an inquiry into the factual basis of the claim. *People v. Ayres*, 2017 IL 120071, ¶ 11. The trial court's inquiry must be adequate to determine the factual basis. *Id.* If the factual basis is found to be lacking on the merits or to involve only matters of trial strategy, then the court need not appoint new counsel and may deny the claim; if,

however, the trial court determines that the allegations show possible neglect, then new counsel should be appointed. *Id.*

¶ 178   While the inquiry's form is not prescribed, it is expected that the trial court may discuss the defendant's allegations with both the defendant and the defendant's trial counsel. *Id.* ¶ 12. As well, the court may base its determination on its knowledge of the defense counsel's performance during the trial and the insufficiency of the defendant's allegations. *Id.* The point of the proceeding is for the court to fully consider the defendant's *pro se* claim and to create a sufficient record for any claims raised on appeal. *Id.* ¶ 13.

¶ 179   Initially, we note that the trial court held a proper and sufficient inquiry. While the court did not let defendant read his prepared statement or motion indefinitely, the record indicates that the trial court read the motion, defendant's prepared statement, and the exhibits attached to the motion before inquiring with Zimmerman about his representation. The proceeding fully ascertained and considered defendant's claims. *Id.*

¶ 180   Defendant's first basis for his posttrial claim of ineffective assistance is counsel's failure to object during the State's closing arguments. We determined above that no prejudice accrued from the failures to object. Accordingly, we reject defendant's argument on this point.

¶ 181   Next, defendant argues that the failure to call Chavez to rebut Misner's testimony that she saw Chavez the day before the shooting demonstrated possible neglect. When asked by the trial court, Zimmerman indicated it was a strategic decision to attempt to insinuate to the jury that Chavez was involved in the shooting while defendant was not. Defendant suggests that Zimmerman's explanation of strategy did not make sense. Nevertheless, we note that the State introduced evidence that, on February 5, 2008, Chavez had clocked into work in the morning and

clocked out of work in the evening. Thus, there was evidence that Chavez was not in Clark's neighborhood. To that extent, Chavez's testimony was unnecessary.

¶ 182    However, the issue seems largely collateral. Misner testified that, On February 5, 2008, at about 12:15 p.m., she saw the blue van parked near her house and identified Chavez as the driver. The primary significance is the identification of the van. However, the eyewitnesses to events on February 6, 2008, also identified the blue van and defendant. Misner's testimony does not significantly enhance the February 6 witnesses' testimony. Therefore, the failure to rebut Misner's already somewhat impeached testimony about seeing Chavez the day before the shooting could not have been prejudicial. As there was no conceivable prejudice, the failure to call Chavez could not have been indicative of possible neglect.

¶ 183    Defendant argues that counsel did not fully investigate other individuals who may have been dissatisfied with Clark's representation. We note that counsel filed defendant's eighth motion *in limine* seeking to introduce evidence of other clients' dissatisfactions with Clark's representation, so counsel had obviously investigated sufficiently to present the motion *in limine*. Nevertheless, defendant raises Robert Appelgren as a former client of Clark's who was dissatisfied with Clark's performance. Appelgren was also apparently sufficiently alarming that his own son told police that he was crazy enough to have shot Clark. Defendant also notes that Patricia Wakenight had been dissatisfied with Clark's representation. This topic seems to be subsumed in the trial court's question to Zimmerman whether he had conducted an adequate inquiry, to which Zimmerman replied that he had, and Zimmerman's response is supported by the fact of the motion *in limine*. Moreover, defendant's argument is insufficiently specific. We also note that defendant attached documentation showing that Appelgren's criminal offenses seemed to be remote in time

as was Clark's representation of Wakenight. Thus, it is unclear that defendant provided sufficient allegations of neglect, based on the overall inquiry conducted by the trial court and its knowledge of the proceedings in this case.

¶ 184 We therefore hold that the trial court conducted a proper inquiry into defendant's allegations of neglect and did not err in refusing to appoint new counsel.

¶ 185                                    III. CONCLUSION

¶ 186 For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

¶ 187 Affirmed.